# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**SAMUEL J. BEASLEY**
Muncie, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**CHANDRA K. HEIN**
Deputy Attorney General
Indianapolis, Indiana

FILED

May 07 2014, 9:31 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

RAHSAAN A. JOHNSON,          )
                            )
   Appellant-Defendant,     )
                            )
      vs.                 )          No. 18A02-1304-CR-343
                            )
STATE OF INDIANA,            )
                            )
   Appellee-Plaintiff.      )

APPEAL FROM THE DELAWARE CIRCUIT COURT
The Honorable Marianne L. Vorhees, Judge
Cause No. 18C01-1204-FD-88

**May 7, 2014**

**OPINION - FOR PUBLICATION**

**RILEY, Judge**

## STATEMENT OF THE CASE

Appellant-Defendant, Rahsaan A. Johnson (Johnson), appeals his conviction of fourteen Counts of possession of animals for fighting contests, Class D felonies, Ind. Code § 35-46-3-8.

We affirm.

## ISSUES

Johnson raises two issues on appeal, which we restate as follows:

(1) Whether there is sufficient evidence beyond a reasonable doubt to support Johnson's conviction of possession of animals for fighting contests; and

(2) Whether Johnson's conviction of fourteen Counts of possession of animals for fighting contests violates the double jeopardy clause of the Indiana Constitution.

## FACTS AND PROCEDURAL HISTORY[1]

On March 19, 2012, two crates were shipped from the Dominican Republic and arrived at the Indianapolis International Airport a day later. The importer, Johnson, traveled from his home in Muncie, Indiana to Indianapolis to pick up his cargo from the Customs Office. Inside of each crate was a live dog. A Customs agent noticed that the dogs were covered in bite marks and scars and were clearly in very poor health, so as Johnson waited for Customs to clear his shipment, the Customs agent contacted Homeland Security Investigations and the Animal Plant Health Inspection Service. Both agencies

---

[1] We note that nearly every citation to the Transcript in Johnson's appellate brief is incorrect. It is an inefficient use of this court's resources to search through more than 1300 pages to locate the referenced information.

2

declined to investigate the matter, so the Customs agent requested assistance from the Indianapolis Airport Police. Johnson explained that the dogs were family pets, and although Customs eventually released the dogs to Johnson, the Assistant Chief of the Airport Police contacted the Muncie Police Department to report his observations and concerns about Johnson's dogs.

Approximately one week later, on March 28, 2012, the Muncie Animal Shelter (Shelter) received a report from the City Building Commissioner of dogs barking from inside an apparently abandoned trailer located at 2407 North Blaine Street. The next day, the Shelter's superintendent, Phillip Peckinpaugh (Peckinpaugh), went to the reported address to investigate the complaint. When Peckinpaugh arrived at the mobile home, it appeared that nobody was there. Through a dilapidated fence, Peckinpaugh observed six dogs chained up in the back yard. In addition to the heavy tow chains restraining the dogs, Peckinpaugh noticed that most of the dogs had severe scarring on their faces, one was tangled up and unable to move, and none had any food or water. Peckinpaugh also heard the sounds of other dogs coming from inside the garage and the residence. At this point, he called the Muncie Police Department. The police officers arrived on scene and, after observing the exterior of the property and speaking with Peckinpaugh, obtained a warrant to search the mobile home.

Once inside, Peckinpaugh and the police officers were greeted by the "overpowering" scent of "feces and urine." (Transcript p. 468). The trailer, which did not have running water, was in shambles. In each room of the narrow mobile home, Peckinpaugh and the officers discovered dog cages stacked and crammed into every

3

available space. Most of the plastic and metal cages housed a dog, but other broken cages were also strewn about the filthy house and yard. While there were bowls stashed on top of some of the dog cages, none of the animals had any food or water. The cages, some of which were too small to accommodate the dog living inside of it, were lined with soiled newspapers. Likewise, the garage was filled with caged dogs. After Peckinpaugh and the other Shelter employees removed the dogs from the premises, the police officers further investigated the scene. They seized twenty-two plastic and metal cages; three treadmills designed or modified for dog use; multiple harnesses, leads, cloth and leather muzzles, and weighted collars; and various containers and buckets of pet care products and supplements, including Penicillin, wound ointment, Epsom salt, iron supplements, vitamins, weight boosting supplements, and syringes.

From the mail found inside the residence, the police officers ascertained that the trailer belonged to Johnson. Johnson, who did not live in the mobile home, had leased the property for $200 per month for the sole purpose of quartering his dogs.[2] Despite the lease agreement's prohibition of "pets or other animals[,]" a total of twenty-five dogs were confiscated from the property, including the two imported from the Dominican Republic nine days earlier. (State's Exh. 27, p. 76). All of the dogs were American Staffordshire Terriers or a mix of the breed, which are more commonly referred to as pit bulls. The dogs ranged in age from approximately five weeks to eight years, included both males and females, and were not neutered or spayed.

---

[2] The residence and yard were left in such a deplorable state that, following the removal of the dogs, city officials condemned the mobile home and ordered that the landlord incur the expense of its demolition.

Within the two weeks following the dogs' removal, two veterinarians, Dr. Teresa Calvert (Dr. Calvert) and Dr. Roger Smith (Dr. Smith), volunteered their time and respectively examined eleven and fourteen of the dogs. In addition to their observations of scarring, scabbing, lacerations, and penetrating wounds on nineteen of these dogs, Dr. Calvert and Dr. Smith noted findings that included: thin/underweight dogs with muscle waste and prominent rib, spine, and hip bones; fungal and yeast infections; untreated "cherry eyes"; inflammation; torn dew claws; being down on their pasterns as the result of malnutrition and lack of exercise; bow-leggedness and other orthopedic conditions and deformities; and parasites, worms, and mange. Both veterinarians testified that the wounds and scarring were consistent with dog-fighting injuries. While the veterinarians described the specific maladies of each dog, the condition of Dog 1—as he was referred to throughout the trial—was particularly gruesome. As x-rays demonstrated, a large, open puncture wound on the dog's cheek had become so infected that the entire left side of the dog's head was drastically swollen. Along with the "open puncture/draining wounds[,]" Dr. Smith noted that there were numerous other scars in various stages of healing all over the dog's face, trunk, and forelegs. (State's Exh. 34, p. 86). Dog 1 was euthanized only six days after his removal from the trailer.

At the Shelter, an animal behaviorist, a pit bull rescue group, and a team from the American Society for the Prevention of Cruelty to Animals (ASPCA) evaluated the dogs' temperaments. In addition to being timid around humans, many of the dogs were exceptionally aggressive, especially toward other animals. In fact, one of the pit bulls escaped from her kennel and killed another dog. Although the Shelter endeavored to place

5

all of the confiscated pit bulls into adoptive homes, those that were too aggressive to function in "a normal pet society" were euthanized. (Tr. p. 676).

On April 13, 2012, the State filed an Information but subsequently dismissed and amended several of the charges. Ultimately, the State charged Johnson with fourteen Counts of possession of animals for fighting contests, Class D felonies, I.C. § 35-46-3-8; two Counts of purchasing animals for fighting contests, Class D felonies, I.C. § 35-46-3-8; one Count of promoting an animal fighting contest, a Class D felony, I.C. § 35-46-3-9.5; and nine Counts of cruelty to an animal, Class A misdemeanors, I.C. § 35-46-3-7(a). With the exception of the charge for promoting an animal fighting contest, each of the other twenty-five Counts correlated with one particular dog.

On April 23, 2012, pursuant to Indiana Code section 35-46-3-6(e), the trial court ordered the State Veterinarian to conduct an investigation of the condition of the animals seized from Johnson's lot. The State Veterinarian subsequently appointed Dr. Melissa Justice (Dr. Justice), a field veterinarian for the Indiana State Board of Animal Health, to evaluate the dogs. On April 30, 2012, when Dr. Justice traveled to Muncie to examine the animals, only five dogs remained at the Shelter as the rest had been adopted or euthanized. In the dogs she examined, Dr. Justice found extensive scarring and wounds at various stages of healing on three of the dogs, which she testified were consistent with dog bites. Dr. Justice's findings also included low body weights and skittish demeanors in some of the dogs. Based on Dr. Justice's review of all of the evidence, she opined that the dogs "were in jeopardy prior to being removed" from Johnson's custody. (Tr. p. 446). By the

6

end of May 2012, thirteen of the dogs had been adopted, and twelve were euthanized for either medical or temperament reasons.

On October 19, 2012, Johnson filed a motion to dismiss all twenty-six of the charges against him. He alleged that his constitutional rights had been violated because the dogs were either euthanized or adopted without the court's permission and without first providing him an opportunity to have the animals examined by his veterinarian, thus inhibiting his ability to form a proper defense. Following a hearing, the trial court denied Johnson's motion to dismiss on October 25, 2012.

A six-day jury trial commenced on October 29, 2012. When the State rested its case-in-chief, Johnson moved for a directed verdict. In response, the trial court dismissed the sole Count of promoting an animal fighting contest on double jeopardy grounds, as well as two Counts of animal cruelty due to insufficient evidence. On November 5, 2012, following the close of the evidence, the jury returned a verdict of guilty on all fourteen Counts of possession of animals for fighting contests and the remaining seven Counts of animal cruelty. The jury found Johnson not guilty of the two Counts of purchasing animals for a fighting contest. Immediately thereafter, the trial court entered a judgment of conviction for fourteen Class D felonies and seven Class A misdemeanors.

On March 1, 2013, the trial court held a sentencing hearing. The trial court sentenced Johnson to a term of three years for each of the fourteen Counts of possession of animals for fighting contests, to be served concurrently. For the seven Counts of animal cruelty, Johnson received concurrent one-year sentences. The trial court ordered that the one-year terms be served consecutively to the three-year terms for an aggregate sentence

7

of four years, all executed in the Indiana Department of Correction. Thereafter, Johnson posted a bond and has deferred his incarceration pending appeal.

Johnson now appeals. Additional facts will be provided as necessary.

DISCUSSION AND DECISION

I. *Sufficiency of the Evidence*

A. *Standard of Review*

Johnson first claims that there is insufficient evidence to sustain his conviction of possession of animals for fighting contests. Our standard of review for sufficiency of the evidence cases is well established. Our court will not reweigh evidence or assess the credibility of witnesses, and we will consider only the evidence most favorable to the verdict, along with any reasonable inferences that may be drawn therefrom. *Clemons v. State*, 987 N.E.2d 92, 95 (Ind. Ct. App. 2013). As long as the evidence and all derivative inferences "constitute substantial evidence of probative value to support the judgment[,]" we will affirm the conviction. *Id.* Where a conviction is based, at least in part, on circumstantial evidence, the "evidence need not overcome every reasonable hypothesis of innocence." *Id.* "Reversal is appropriate only when reasonable persons would not be able to form inferences as to each material element of the offense." *Id.*

B. *Possession of Animals for Fighting Contests*

Under Indiana law, it is a Class D felony if an individual "knowingly or intentionally purchases or possesses an animal for the purpose of using the animal in an animal fighting contest." I.C. § 35-46-3-8. An "animal fighting contest" is defined as "a conflict between two (2) or more animals. The term does not include a conflict that is unorganized or

8

accidental." I.C. § 35-46-3-4. Johnson was convicted of fourteen Counts of this offense.[3]

This statute does not require the State to prove that Johnson hosted an animal fight or that he ever used the dogs in an animal fighting contest; rather, Johnson's intended purpose in possessing the pit bulls is the pertinent consideration. *See, e.g.*, I.C. §§ 35-46-3-9 to -10. It is well established that "[i]ntent may be proved by circumstantial evidence [and] can be inferred from a defendant's conduct and the natural and usual sequence to which such conduct logically and reasonably points." *Lee v. State*, 973 N.E.2d 1207, 1210 (Ind. Ct. App. 2012) (citation omitted), *trans. denied*. "The fact finder is entitled to infer intent from the surrounding circumstances." *Id.*

Johnson concedes that the testimony of the three veterinarians and Terry Mills (Mills), the ASPCA's Director of Blood Sports Investigations, in conjunction with the paraphernalia recovered from the trailer, "could reasonably support the inference by the jury that the animals had been involved in animal fighting *in the past*." (Appellant's Br. p. 18). However, according to Johnson,

> this is not enough. It must be demonstrated in some way that [] Johnson maintained the purpose to fight his animals at some future time, and the method of proof must be more than *they were used in animal fighting contests in the past, so the inference is made that the individual in possession intends to use them in that way in the future*.

(Appellant's Br. p. 18).

To date, there is only one appellate decision concerning the sufficiency of the evidence used to obtain a conviction pursuant to Indiana Code section 35-46-3-8. In

---

[3] Johnson does not challenge his conviction of seven Counts of cruelty to an animal.

9

*Clemons*, 987 N.E.2d at 95, Clemons was convicted of possessing animals to use in animal fighting contests. Despite Clemons' argument that there was no evidence that he had actually participated in a cockfight, our court found overwhelming evidence that Clemons knowingly or intentionally possessed "battle cocks" for fighting purposes. *Id.* at 95-96. In addition to the 193 roosters and hens recovered from Clemons' property at a ratio of two or three roosters for every hen, which is "indicative of a cockfighting operation," the evidence revealed that a majority of the roosters had been "dubbed" to prevent their wattles and combs from excessive bleeding; fifty of the roosters were tethered to cages with their food and water placed on top of barrels; many of the roosters had shortened spurs; and cockfighting gear such as magazines, training regimens, grooming tools, medicines, and dietary supplements were discovered in Clemons' possession. *Id.* Although Clemons attempted to characterize the evidence as tools and techniques used by legitimate bird breeders, the totality of the circumstances established that those roosters were slated to fight. *Id.* at 96.

We find the present situation to be analogous to *Clemons*. There is no direct evidence of Johnson engaging these dogs in an actual, organized dog fight, and it is undisputed that there were no "dog fighting pits" on the property. (Tr. p. 734). Nevertheless, the record reveals that Johnson accumulated twenty-five pit bulls, fourteen of which are the subjects of these charges. Three veterinarians testified that, among other ailments, all fourteen of these dogs were covered in scars, scabs, and puncture wounds at various stages of healing. Furthermore, all of the veterinarians stated that the bite marks and wounds—which were primarily concentrated on the dogs' faces, ears, front legs, necks,

10

and chests—were consistent with injuries that would be sustained in a dog fight. Likewise, Mills testified that in a dog fight, "the most consistent injuries are in the front of the dog, the chest, and the forearms and the muzzle area and ears." (Tr. p. 760).

As in *Clemons*, the presence of paraphernalia further supports a finding that Johnson was conditioning the pit bulls to fight. Police officers seized dog treadmills, weighted harnesses and collars, and various types of weight-boosting and performance-enhancing supplements, all of which are commonly used to train dogs for a fight. *See* I.C. § 35-46-3-4.3 (defining "animal fighting paraphernalia"). Johnson correctly posits that there is nothing illegal about merely possessing dog treadmills and harnesses. If the evidence had otherwise consisted of a muscular, healthy, well-nourished and confident pit bull, the paraphernalia would likely be insignificant to uphold his conviction, but such is not the case. Moreover, Mills, who was involved in eighty-six dog fights during an eighteen-month undercover operation with the FBI, explained that following a fight, the dog handlers do not take their dogs to a veterinarian. Instead, the handlers personally treat the dogs' injuries. To this end, the police officers found five bottles of Penicillin, syringes,[4] and several types of wound spray and ointment in Johnson's trailer.

Johnson attempts to distinguish his case from *Clemons*, citing the fact that Clemons had discussed the desirable qualities of cockfighting roosters with the director of the humane society, who was posing as an interested buyer, and that Clemons had been

---

[4] Johnson testified that he used the syringes to give the puppies their shots and to administer dietary supplements, but the jury also heard the veterinarians' findings that the puppies were infested with parasites and worms.

11

featured in a cockfighting trade journal giving advice on aggressive bird breeding. However, Johnson fails to note that Clemons had admitted to participating in cockfighting *in the past* but maintained that he adhered to Indiana law and limited his activities to selling, buying, and breeding roosters. *Clemons*, 987 N.E.2d at 93-94. Contrary to Johnson's argument that the dogs' fighting history cannot be indicative of their future purpose, the *Clemons* court found the evidence that the roosters had been used to fight in the past, combined with the fighting paraphernalia, was sufficient to uphold Clemons' conviction. We find the same rationale applies in Johnson's case.

We also find little merit in Johnson's endeavor to shift the blame for the dogs' shocking conditions. With the exception of one dog, which Johnson claimed had received facial scars by chewing through the metal siding of the garage, Johnson testified that all of the other dogs were in perfect health, having no scars or injuries, at the time they were confiscated. Per Johnson, these dogs sustained their scars because the Shelter allowed them to fight, and the Shelter failed to provide the animals with proper nourishment. Even if we could fathom these accusations, it is not the role of our court to assess witness credibility or weigh the evidence. *See Fuller v.* State, 674 N.E.2d 576, 578 (Ind. Ct. App. 1996). Thus, it was well within the province of the jury to believe the concurring testimony of three veterinarians, an ASPCA blood sport expert, multiple police officers, and the Shelter's superintendent.

### C. *Other Purposes*

Johnson contends that the evidence is insufficient to prove his intent because "there are non-animal fighting reasons to maintain possession of the animals, as well as the

12

paraphernalia." (Appellant's Br. p. 19). During the trial, Johnson explained that he kept twenty-five pit bulls in an otherwise abandoned trailer in order to enter the pit bulls into conformation and weight-pulling competitions, which are legal activities. Johnson also maintained that some of the dogs were strictly used for breeding purposes or for companionship. In support of his position, Johnson submitted photographs of some ribbons and trophies as "examples of things [he had] won" at dog shows and stated that he had been training two of the dogs for a weight-pulling competition that was scheduled to occur one month after the dogs were seized. (Tr. p. 985). As such, Johnson explained that he had been using the four-pound weighted collars to condition the dogs to pull a half-ton payload and that he was feeding the dogs a special diet to reduce them to their lowest weight while still building muscle. With respect to his breeding claim, Johnson submitted several photographs depicting a few of the dogs in the act of mating.

We find that Johnson's arguments amount to a request to reweigh the evidence, which we decline to do. *See Clemons*, 987 N.E.2d at 96. The record contains sufficient contradictory evidence of Johnson's illicit purpose for keeping twenty-five caged pit bulls, and "reasonable minds could reach the inferences drawn by the jury." *Fuller*, 674 N.E.2d at 578. As both Dr. Justice and Mills explained, weight-pulling contests necessitate healthy, heavily muscular dogs. Mills also described how dog handlers must ensure their dogs do not exceed a specific predetermined fight weight, and although weight-pulling contests do not generally include dogs covered in scars, some dog handlers do participate "as a cover for their dog fighting." (Tr. p. 770). Johnson, who was previously cited while living in New Jersey for failing to provide dogs with food and water, specified that he

13

regularly took photographs of the dogs' activities in order to defend himself against accusations such as those at hand. Yet, he stated that he did not keep records of the puppy litters, dog sale/exchange transactions, or pedigrees; nor did he offer a single photograph of his dog(s) participating in a competition.

We do not dispute Johnson's assertion that "millions of Hoosiers own animals, and the vast majority of them would never dream of using them in an animal fighting contest." (Appellant's Br. p. 19). It is clear from the evidence, however, that Johnson is not included among this majority of Hoosiers. Accordingly, we find that there was sufficient evidence for the jury to determine that Johnson possessed these fourteen pit bulls for the purpose of animal fighting. Fortunately for Johnson, the Indiana Department of Correction will not subject him to the inhumane conditions that he forced upon those twenty-five dogs.

## II. *Double Jeopardy*

Johnson also claims that his conviction merits reversal because it violates the double jeopardy clause of the Indiana Constitution. Article I, Section 14 of the Indiana Constitution provides: "No person shall be put in jeopardy twice for the same offense." Our supreme court has developed the following two-part test for reviewing double jeopardy claims:

> [T]wo or more offenses are the "same offense" in violation of Article I, Section 14 of the Indiana Constitution, if, with respect to either the statutory elements of the challenged crimes or the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense.

14

*Lee v. State*, 892 N.E.2d 1231, 1233 (Ind. 2008) (quoting *Richardson v. State*, 717 N.E.2d 32, 49 (Ind. 1999)). In this case, Johnson claims that his conviction cannot be sustained under the actual evidence portion of the same offense test.

According to Indiana's double jeopardy jurisprudence, "the actual evidence presented at trial is examined to determine whether each challenged offense was established by separate and distinct facts." *Richardson*, 717 N.E.2d at 53. The defendant must establish "a reasonable probability that the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to establish the essential elements of a second challenged offense." *Id.* A reasonable possibility that the fact-finder relied on the same facts for multiple offenses "requires substantially more than a logical possibility" and "turns on a practical assessment of whether the jury may have latched on to exactly the same facts for both convictions." *James v. State*, 953 N.E.2d 1191, 1194 (Ind. Ct. App. 2011). On review, we consider the charging information, jury instructions, and arguments of counsel to determine the facts relied upon by the jury for each element of each offense. *Id.* If "the evidentiary facts establishing the essential elements of one offense also establish only one or even several, but not all, of the essential elements of a second offense[,]" there is no double jeopardy violation. *Spivey v. State*, 761 N.E.2d 831, 833 (Ind. 2002).

The essential elements of the charged offense are that Johnson (1) knowingly or intentionally (2) possessed the dogs (3) for the purpose of using each dog in an animal fighting contest. I.C. § 35-46-3-8. It is undisputed that Johnson owned the fourteen pit bulls forming the bases for these charges. Johnson asserts a double jeopardy violation

because "the jurors may have very well considered the presence and condition of [the thirteen other dogs] in finding that [he] did, in fact, intend to involve [one dog] in an animal fighting contest." (Appellant's Br. p. 24). As a result, Johnson seeks reversal on thirteen of the fourteen Counts. We disagree. The record is replete with evidentiary facts to independently support each of the fourteen charges of possessing animals for fighting purposes. Dr. Calvert, Dr. Smith, and Dr. Justice testified about the specific dog fight-type injuries found on every single dog. Photographs of the individual animals also illustrated the severity of each dog's battle scars for the jurors to assess.

Johnson further notes that the jury received an instruction about the statutory definition of an "animal fighting contest." (Appellant's Br. p. 23). Because the jury was specifically informed that such a conflict requires a minimum of two animals, Johnson argues that the jury could "have considered the fact that there were in that one location the multiple animals necessary to hold an animal fighting contest in arriving at the ultimate conclusion." (Appellant's Br. p. 24). Again, we disagree. During the trial, Mills described, in great detail, the customs of organized dog fights. As Mills explained, dog handlers do not pit two of their own dogs against each other in a fight. Because of the wagers and reputations at stake, each dog represents a potential value to its owner which is contingent upon the outcome of a fight. A winning dog is credited with respect, whereas it is not uncommon for a handler to execute his dog following a loss. Moreover, the logistics of the actual fight resemble a boxing match in that each handler remains in his dog's respective corner; he picks the dog up between rounds, sponges the dog's face, and acknowledges to the referee when his dog shows weakness during the fight. Because there

16

is evidence that each of the fourteen dogs was possessed for the purpose of fighting against the dog of a different handler, we find Johnson's contention that the jury relied on the same facts to be unfounded.

CONCLUSION

Based on the foregoing, we conclude that there is sufficient evidence to uphold Johnson's conviction of fourteen Class D felonies for possession of animals for fighting contests, and his conviction does not violate the double jeopardy clause of the Indiana Constitution.

Affirmed.

ROBB, J. and BRADFORD, J. concur