# FOR PUBLICATION



ATTORNEY FOR APPELLANT:

**PATRICK A. DUFF**
Duff Law, LLC
Evansville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JUSTIN F. ROEBEL**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| STEVEN M. SANDLEBEN, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 82A05-1403-CR-95 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE VANDERBURGH CIRCUIT COURT
The Honorable David D. Kiely, Judge
Cause No. 82C01-1310-FD-1071

**December 11, 2014**

**OPINION - FOR PUBLICATION**

**NAJAM, Judge**

## STATEMENT OF THE CASE

Steven Sandleben appeals his convictions for three counts of public voyeurism,[1] two as Class D felonies and one as a Class A misdemeanor, following a bench trial. He presents five issues for our review, which we revise and restate as follows:

1.      Whether the evidence is sufficient to support his convictions.

2.      Whether the voyeurism statute, as applied, is unconstitutionally vague.

3.      Whether the trial court abused its discretion in admitting certain business records.

4.      Whether the trial court abused its discretion when it sentenced him.

5.      Whether his sentence is inappropriate in light of the nature of the offenses and his character.

We affirm.

## FACTS AND PROCEDURAL HISTORY

On August 12, 2013, as Stephanie Newton shopped in an Evansville store with her three children, she observed Sandleben squat down and place his hand up the skort[2] of her four-year-old daughter, E.N. When Newton screamed at Sandleben to get away from her daughter, Sandleben pulled his hand from under the skort, apologized, and quickly left the store. When he did, Newton observed that Sandleben held what looked like a cell phone in his hand, which he slipped into his pocket as he left. Newton followed him to the door of the store to get a description of his vehicle and called police.

---

[1] Sandleben does not appeal his conviction for possession of paraphernalia.

[2] A skort, as the name suggests, combines a skirt and a pair of shorts into a single item of clothing.

2

Based on the information provided by Newton, police were able to locate Sandleben at his apartment on that same day. When officers arrived at Sandleben's apartment, he answered the door, and the officers observed computer equipment inside the apartment. They detained Sandleben, and Newton arrived for a show-up identification, at which time Newton positively identified Sandleben as the man from the store. Police then obtained a search warrant for Sandleben's apartment and cell phone and, during its execution, seized a pocket camera, SD memory cards, a computer tower with five hard drives, and marijuana paraphernalia. Later, Detective Brad Evrard, of the Evansville Police Department, performed forensic computer analysis on the cell phone, one hard drive,[3] and an SD card. On the SD card, he found nineteen deleted files, including three videos of young girls playing in the Evansville store. In the third video, the camera is momentarily placed under E.N.'s skort.

In addition to the files recovered from the SD card, Detective Evrard also found over 200 digital videos on the hard drive. Thirteen of the videos, titled "[H] and [L]" were found in a folder titled "siterock." Tr. at 62. When Evrard Google-searched the term "siterock," it returned a post from a user by that name on an Internet website called TheCandidForum.com. The profile picture associated with siterock's account depicted Sandleben. On the website, siterock had authored 178 threads, one of which was titled "[H] and [L]." Id. Evrard discovered that the videos on the computer and the videos from TheCandidForum were the same. They came from an underwater camera, which had been zoomed in and focused on the lower bodies, legs, and crotch areas of two young

_____

[3] The other four hard drives were encrypted, which precluded Evrard from accessing them.

girls swimming in what Evrard recognized as a local pool. Evrard then cross-referenced the names [H] and [L] with local school records and successfully identified the two victims from the video, H.W. and L.N. Both were twelve years old.

The State charged Sandleben with three counts of public voyeurism; one count of possession of marijuana, as a Class A misdemeanor; and one count of possession of drug paraphernalia, as a Class A misdemeanor. One count of public voyeurism related to E.N. and was charged as a Class A misdemeanor. The other two counts related to H.W. and L.N. and were charged as Class D felonies for the electronic dissemination of the videos on the Internet. The State subsequently dismissed the charge for possession of marijuana.

The trial court held Sandleben's bench trial on January 8, 2014. At trial, H.W. testified about her encounter with Sandleben in the local pool. She stated that Sandleben had approached her as she swam with L.N. and had asked their names and ages.[4] At some point, H.W. observed an object in Sandleben's hand and asked whether it was an underwater camera. Sandleben confirmed that it was, but he stated that he was not using it. H.W. further testified that she did not give Sandleben permission to film.

In addition to the videos of E.N., the trial court admitted into evidence the underwater videos of H.W. and L.N. In these videos, the girls wear two-piece bathing suits while they swim and play in the pool. One of the girls wears a string bikini, while the other wears a bikini top with bathing-suit shorts. During the course of the videos, while the girls moved their legs back and forth, Sandleben captured the girls in positions where their legs were spread widely apart. These movements caused water to enter

---

[4] L.N. told Sandleben that the two were fourteen-years old.

behind the swimsuit fabric and to separate the fabric from the girls' bodies. In turn, Sandleben either zoomed in his camera or moved towards the girls to get a closer view of their crotches, which allowed him to video the bare skin exposed by visible gaps both at the buttocks and where the inner thighs meet the pubic arch of the pelvis. Also, at one point, the girl in the string bikini can be seen touching the string holding up one side of her bikini bottom, and Sandleben's camera immediately zooms in to her crotch. And, on at least two other occasions, that same girl does a summersault in the water, and her bathing-suit bottom visibly separates from her buttocks.

Donald Baumholser, a Manager of Field Operations at Time Warner Cable ("TWC"), also testified regarding a record of subscriber information kept by TWC in the ordinary course of business. That record indicated that Sandleben was a TWC subscriber with the username "siterock@twc.com." The trial court admitted the records Baumholser authenticated over defense counsel's objections.

At the conclusion of trial, the court found Sandleben guilty on all counts. It explained its judgment on the public voyeurism counts as follows:

> The Court stands by its ruling that the bathing suit is not an undergarment[,] and that's no[t] how the Court found [Sandleben] guilty because this Court does not feel that the, a bathing suit is an undergarment. The Court finds that [Sandleben] did peep at the private area of the young ladies that he video taped. He recorded images of the nude pubic area of the girls and he did that through [h]is video taping of them under the water with a camera that they were not aware of[,] and the Court is going to cite some . . . times of clips where I think it supports the courts finding. . . . [Sandleben] was able to use his camera to actually move in and follow with the movements of the young lady to get a better view of the pubic area that he was trying to film. . . . [B]ased upon all those clips and the entire video, the Court again found that [Sandleben] did video tape the pubic area of these young ladies, uncovered pubic areas of these young ladies. The Court also finds that[,] in an alternative theory[,] that [Sandleben] is guilty under the attempt

5

statute[,] which is an included offense of that charge and the Court bas[e]s that upon, if you watch the series of the videos[,] what you saw was [Sandleben] started at a point away from the victims and then gradually moved in and became focused on the sole crotch area and would focus in and zoom in as tight as he could to get as good a look as possible during the entire event[,] trying, in this Court's opinion, to possibly get the naked genitals or the pubic area, and an even better view than what he had before, and the Court feels that this is a substantial step towards actually seeing the uncovered genitals or the uncovered pubic area of the young ladies. So, the Court finds [Sandleben] did have the intent to look at the pubic area as well as the uncovered genitals and that he did take a substantial step towards seeing those areas.

Tr. at 88-90.

The court sentenced Sandleben to concurrent three-year-sentences in the Department of Correction for the Class D felony counts of voyeurism to be served consecutive to two concurrent one-year sentences in Community Corrections for the misdemeanor voyeurism and possession charges. Thus, Sandleben received an aggregate four-year sentence, with three years executed in DOC and one year in Community Corrections. In sentencing Sandleben, the court noted:

the mitigators that were pointed out by the defense counsel, [Sandleben] has no prior record. Defense counsel argues that [Sandleben] is remorseful[;] it's difficult for the Court to determine when someone is remorseful . . . , so the Court doesn't put a lot of weight into that. The Court understands the argument you make that it's a hardship on his dependent[;] I'm not sure that I can find that[,] the way he's victimized these other children. I disagree with the IRAS score that he's a low risk to [re]offend . . . . I disagree with the probation department's recommendation[;] I think they're wrong in this case[.] [T]hey don't understand how serious this crime is and how morally wrong what he did was and how criminal it was. The aggravating circumstances are the fact that the victim's [sic] in this case are all minors, one being a four[-]year[-]old, the other two being teenagers [sic], talking about two separate incidents on separate dates. . . . [T]he court does note the similarity of the stalking case that's pending now to the facts in this case.

Id. at 107-10. This appeal ensued.

6

## DISCUSSION AND DECISION

### Issue One: Sufficiency of the Evidence

Sandleben contends that his convictions for public voyeurism are not supported by sufficient evidence. Our standard of review for sufficiency of the evidence claims is well-settled. Tobar v. State, 740 N.E.2d 109, 111 (Ind. 2000).

> In reviewing the sufficiency of the evidence, we examine only the probative evidence and reasonable inferences that support the verdict. We do not assess witness credibility, nor do we reweigh the evidence to determine if it was sufficient to support a conviction. Under our appellate system, those roles are reserved for the finder of fact. Instead, we consider only the evidence most favorable to the trial court ruling and affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt.

Pillow v. State, 986 N.E.2d 343, 344 (Ind. Ct. App. 2013) (citations and quotation marks omitted).

In order to prove that Sandleben committed public voyeurism, as a Class A misdemeanor, the State was required to prove beyond a reasonable doubt that Sandleben, without consent and with intent to peep at the private area of an individual, peeped at the private area of an individual and recorded an image by means of a camera.[5] Ind. Code §§

---

[5] In Delagrange v. State, 5 N.E.3d 354, 355 (Ind. 2014), Delagrange went to an Indianapolis mall with a hidden camera attached to his shoe and took upskirt photographs of minor women shopping at the mall. Id. Initially, among other crimes, the State charged Delagrange with four counts of child exploitation and ten counts of Class D felony voyeurism. Id. However, at the time, the voyeurism statute did not encompass Delagrange's behavior. Instead, it criminalized the conduct of a conventional "peeping Tom"; it protected only areas with traditional expectations of privacy: the home, restrooms, baths, showers, and dressing rooms. See Ind. Code § 35-45-4-5(a)(1) to (2) (2010). Accordingly, "[b]y agreement of the parties, the trial court dismissed the voyeurism charges." Delagrange, 5 N.E.3d at 355 (affirming Delagrange's convictions for attempted child exploitation). Subsequently, the legislature amended the voyeurism statute to include the crime of public voyeurism, which brought Delagrange's conduct within the statute. See 2011 Ind. Legis. Serv. 75 (West). The crime of public voyeurism recognizes expectations of privacy in the digital age without criminalizing mere looking within a public space. Thus, whereas peeping into an area with a traditional expectation of privacy is, standing alone, an act sufficient to support a conviction for voyeurism, see I.C. § 35-45-4-5(b)(1)(A), (b)(2) (2012), in a

7

35-45-4-5(d)(1) to (2). The code defines "camera" as "a camera, a video camera, a device that captures a digital image, or any other type of video recording device"; "peep" as "any looking of a clandestine, surreptitious, prying, or secretive nature"; and "private area" as "the naked or undergarment clad genitals, pubic area, or buttocks of an individual." I.C. §§ 35-45-4-5(a)(1) to (3). Public voyeurism becomes a Class D felony if, among other things, the person charged "(1) publishes the image; (2) makes the image available on the Internet; or (3) transmits or disseminates the image to another person." I.C. §§ 35-45-4-5(e)(1) to (3).

Moreover, "[a] person attempts to commit a crime when, acting with the culpability required for commission of the crime, the person engages in conduct that constitutes a substantial step toward commission of the crime. An attempt to commit a crime is a felony or misdemeanor of the same level or class as the crime attempted." I.C. § 35-41-5-1(a). "It is well established that intent may be proved by circumstantial evidence and can be inferred from a defendant's conduct and the natural and usual sequence to which such conduct logically and reasonably points. The fact finder is entitled to infer intent from the surrounding circumstances." Johnson v. State, 9 N.E.3d 186, 191 (Ind. Ct. App. 2014) (citations and quotations omitted), trans. denied.

### Intent

In support of his sufficiency claim, Sandleben first contends that he did not film a "private area," as defined by the public voyeurism statute. Instead, he contends that he filmed a bathing suit and the shorts portion of a skort, neither of which, he reasons, is an

public space, one must peep and record an image by means of a camera. See I.C. § 35-45-4-5(d)(2) (2012).

8

undergarment. Appellant's Br. at 7, 9. But the public voyeurism statute is written in the disjunctive: it speaks of <u>either</u> the undergarment-clad <u>or</u> the naked genitals, public area or buttocks. <u>See</u> I.C. § 35-45-4-5(a)(3). And, here, Sandleben's course of conduct supports a reasonable inference that Sandleben intended to film his victims' private areas, not a pair of shorts or a bathing suit. Thus, we agree with the trial court that Sandleben attempted to commit public voyeurism.[6]

The State presented sufficient evidence that Sandleben attempted to film E.N.'s private area. As our supreme court recently explained in <u>Delagrange v. State</u>, 5 N.E.3d 354, 357-58 (Ind. 2014), a trier of fact can "infer that someone taking 'upskirt' photographs of women and girls . . . does so in the hope that some of them will not be wearing undergarments." In other words, a trier of fact can infer that someone taking "upskirt" photographs "intends to capture not just images of undergarments but also—or instead—images of uncovered genitals." <u>Id.</u> at 358. Thus, the evidence was sufficient to convict Sandleben of public voyeurism with respect to E.N.

The State also presented sufficient evidence with respect to H.W. and L.N. The evidence most favorable to the judgment demonstrates a deliberate attempt to peep at the naked genitals, pubic area, and buttocks of the two twelve-year-old girls. The evidence shows that Sandleben used an underwater camera, which he denied to H.W. that he was using, to capture nearly an hour of digital footage depicting the girls' pubic areas and buttocks. He did so in an environment—a swimming pool—where the fabric of their

---

[6] The trial court watched the underwater videos Sandleben recorded and found that he had successfully filmed the naked pubic regions of H.W. and L.N; attempt was the trial court's alternative theory of liability. Because we hold that the trial court's ruling is supported by its finding that Sandleben attempted to film the naked pubic regions of H.W. and L.N., we do not address the court's former finding.

swimsuits was likely to shift and expose those areas. As the trial court accurately recounted, when the girls' legs were spread apart in the water, Sandleben "started at a point away from the victims and then gradually moved in and became focused on the sole crotch area and would focus in and zoom in as tight[ly] as he could to get as good a look as possible during the entire event." Tr. at 89-90. In so doing, Sandleben captured close-up images of the girls' pubic areas, including images of visible gaps between the girls' bathing suits and their bodies, which exposed bare skin both at the buttocks and where the inner thighs meet the pubic arch of the pelvis. Indeed, to see the same images without a camera, Sandleben would have had to bring his face close to the girls' bodies below their waists.

These actions constitute a substantial step towards the commission of public voyeurism and support the trial court's conclusion that Sandleben had the requisite intent to commit that crime, that Sandleben intended "to possibly [film with his camera] the [girls'] naked genitals or the pubic areas[s]." Id. A fact-finder can reasonably infer that one who records, in a swimming pool, nearly an hour of close-up images of another's pubic area does so in the hope that the fabric of that person's clothing will shift and expose the naked pubic area. See Delagrange, 5 N.E.3d at 357-58. Thus, the trial court did not err in its judgment.

### Consent

Next, Sandleben argues that we should overturn his voyeurism conviction with respect to L.N. because the State failed to offer sufficient evidence that L.N. did not consent to being filmed in the pool. But H.W. testified that she did not give Sandleben

10

permission to record her, and, when she asked Sandleben about his underwater camera, he stated that he was not filming with it. Sandleben, therefore, "knew that he did not have [H.W.'s] consent at the time that he recorded her, and, thus, . . . he knowingly recorded her in a clandestine or secretive manner in an area where" the fabric of her swimsuit was likely to shift and expose her naked genitals, pubic area, or buttocks. Wallace v. State, 961 N.E.2d 529, 533 (Ind. Ct. App. 2012). The same can be said for L.N., who was swimming in close proximity to H.W. The trial court could infer that L.N. was also "not aware that [Sandleben] was recording . . . and did not consent to him doing so."[7] Id. We hold that the evidence was sufficient to convict Sandleben, and we affirm on this issue.

### Issue Two: Vagueness

Sandleben next contends that the public voyeurism statute is unconstitutional as applied.[8] Our standard of review for vagueness challenges is well settled:

> A challenge to the validity of a statute must overcome a presumption that the statute is constitutional. The party challenging the statute has the burden of proving otherwise.
>
> Due process principles advise that a penal statute is void for vagueness if it does not clearly define its prohibitions. A criminal statute may be invalidated for vagueness for either of two independent reasons:

---

[7] Indiana civil law allows a minor to give limited consent in certain situations, for example, to contracts. See, e.g., Mullen v. Tucker, 510 N.E.2d 711, 714 (Ind. Ct. App. 1987). However, Sandleben's surreptitious recording of H.W. and L.N. does not evince a legitimate contractual relationship, such as that present in a genuine, legal photo shoot.

[8] The State contends that Sandleben waived this argument when he failed to raise it in a motion to dismiss prior to trial. We agree. However, waiver notwithstanding, our appellate courts often address as-applied constitutional challenges on their merits for the first time on appeal. See, e.g., Baumgartner v. State, 891 N.E.2d 1131, 1136 (Ind. Ct. App. 2008) (discussing Morse v. State, 593 N.E.2d 194, 197 (Ind. 1992)). Because this case presents one of the first appellate challenges to the constitutionality of the recently-revised public voyeurism statute, to guide both the bench and bar, we address the merits of this argument.

(1) for failing to provide notice enabling ordinary people to understand the conduct that it prohibits, and (2) for the possibility that it authorizes or encourages arbitrary or discriminatory enforcement. A related consideration is the requirement that a penal statute give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden so that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed. . . . [T]here must be something in a criminal statute to indicate where the line is to be drawn between trivial and substantial things so that erratic arrests and convictions for trivial acts and omissions will not occur. It cannot be left to juries, judges, and prosecutors to draw such lines. Accordingly, the statutory language must convey sufficiently definite warning as to the proscribed conduct when measured by common understanding.

But a statute is not void for vagueness if individuals of ordinary intelligence could comprehend it to the extent that it would fairly inform them of the generally proscribed conduct. And the statute does not have to list specifically all items of prohibited conduct; rather, it must inform the individual of the conduct generally proscribed. The examination of a vagueness challenge is performed in light of the facts and circumstances of each individual case.

. . . A statute is void for vagueness only if it is vague as applied to the precise circumstances of the present case. The defendant is not at liberty to devise hypothetical situations which might demonstrate vagueness.

Kaur v. State, 987 N.E.2d 164, 168-69 (Ind. Ct. App. 2013) (citations and quotations omitted) (emphases supplied).

Sandleben reasons that, because the definition of "private area" does not include bathing suits or skorts, he lacked sufficient notice that the law prohibited his conduct. Moreover, he claims that the statute provokes arbitrary or discriminatory enforcement "because conduct such as [his] is never accepted in society, . . . [so] the statute . . . punishes conduct that is otherwise legal." Appellant's Br. at 10-11.

But contrary to Sandleben's argument, "the statute does not have to list specifically all items of prohibited conduct; rather, it must inform the individual of the

conduct generally proscribed." <u>Kaur</u>, 987 N.E.2d at 168. As applied to the precise circumstances of this case, the public voyeurism statute does so. The statute makes it a crime, without consent, to intentionally peep at and record by camera the private area of another. It further defines all material terms, including peep, private area, and camera. And again, private area means "the naked or undergarment clad genital, pubic area, or buttocks of an individual." I.C. § 35-45-4-5(a)(3).

Sandleben's conduct precisely fits that prohibited by the statute. First, as the trial court found, Sandleben, at the least, attempted to view the naked pubic area of H.W. and L.N. We have already explained that the court's judgment was supported by sufficient evidence. Second, in proffering this argument, Sandleben misrepresents the nature of his conduct; he frames the issue as if he merely photographed or videotaped a person wearing a bathing suit or skort. But that is not what he did. For approximately an hour, Sandleben focused an underwater camera almost exclusively onto the pubic areas of two twelve-year-old girls. A person of ordinary intelligence would recognize that this conduct constitutes an attempt to peep at and record the naked genitals, pubic area, or buttocks of another.

The same goes for four-year-old E.N., whom Sandleben victimized with an upskirt video. The skirt component of E.N.'s skort, as one would expect, sufficiently covered the shorts component and her undergarments. Thus, in an attempt to peep at her private area, Sandleben squatted down and placed a camera up and underneath her clothing. We follow our supreme court's holding that it is reasonable to infer that "someone taking 'upskirt' photographs of women and girls . . . does so in the hope that some of them will

13

not be wearing undergarments." Delagrange, 5 N.E.3d at 357. Consequently, a person of ordinary intelligence would also recognize that such conduct is unlawful. For the same reasons, law enforcement did not arbitrarily enforce the public voyeurism statute against Sandleben. We affirm on this issue.

### Issue Three: Business Records

Next, Sandleben claims that the trial court abused its discretion when it admitted TWC business records based on the authenticating testimony of Baumholser.[9] Evidence is admissible if it has any tendency to prove or disprove a material fact, and is not otherwise excluded by an evidentiary rule. Lloyd v. State, 669 N.E.2d 980, 985 (Ind. 1996). A trial court has broad discretion in ruling on the admissibility of evidence, and, on review, we will disturb its ruling only on a showing of abuse of discretion. Brummett v. State, 10 N.E.3d 78, 90 (Ind. Ct. App. 2014). When reviewing a decision under an abuse of discretion standard, we will affirm if there is any evidence supporting the decision. Id. A claim of error in the admission or exclusion of evidence will not prevail on appeal unless a substantial right of the party is affected. Id. In other words, even if the trial court erred in admitting evidence, we will not reverse if that error was harmless. See Williams v. State, 714 N.E.2d 644, 652 (Ind. 1999).

While hearsay is ordinarily inadmissible,

> [b]usiness records are an exception to the hearsay rule because they are imbued with independent indicia of trustworthiness. These indicia are that

---

[9] The State contends that Sandleben waived this argument by objecting on grounds substantially different than those argued here. We disagree. At trial, Sandleben's counsel objected to Baumholser's testimony on two grounds: (1) Baumholser was not the records custodian; and (2) Baumholser had no functional knowledge of the document itself. Thus, the trial court had an opportunity to consider the arguments made on appeal, and Sandleben has not waived the issue for review. See Showalter v. Town of Thorntown, 902 N.E.2d 338, 342 (Ind. Ct. App. 2009), trans. denied.

the business establishes a routine of record-making, that the record is made by one with a duty to report accurately, and that the business relies upon that record in carrying out its activities. The fact that the business record is prepared by a party independent of the business does not negate these factors. So long as the initial informant has personal knowledge of a fact, that fact may be repeated by an infinite number of people as long as each person in the chain is acting in the regular course of business. The recorders themselves need not have first-hand knowledge. Moreover, the sponsor of an exhibit need not have personally made it, filed it, or have firsthand knowledge of the transaction represented by it. The sponsor need only show that the exhibit was part of certain records kept in the routine course of business and <u>placed in the records by one who was authorized to do so, and who had personal knowledge of the transaction represented at the time of entry</u>.

Embrey v. State, 989 N.E.2d 1260, 1264-65 (Ind. Ct. App. 2013) (citations and quotations omitted) (emphasis supplied).

Here, Sandleben argues that Baumholser could not provide an adequate foundation to sponsor the TWC subscriber information record because Baumholser was not the custodian and did not have knowledge of the record sufficient to sponsor it. Although a sponsor need not be the custodian or creator of a proffered record, a sponsor still must have knowledge of how the record was created and filed. Id. Stated differently, although a sponsor "need not have personally made [the record], filed it, or have firsthand knowledge of the transaction represented by it," a sponsor must still testify about how the record was made, who filed it, and that the person who filed it was both authorized to do so and had personal knowledge of the transaction. Id. Baumholser did not do so; he did not explain how the record was created or who created it, much less that an authorized person with personal knowledge of the underlying transaction had created and filed it. Thus, the trial court abused its discretion when it admitted the TWC subscriber information record over defense counsel's repeated objections.

15

However, because the TWC subscriber information record was merely cumulative, we hold that the erroneous admission of that document was harmless error. See Payne v. State, 854 N.E2d 7, 17 (Ind. Ct. App. 2006). The subscriber information record connected Sandleben to his "siterock" username on TheCandidForum, but other properly admitted evidence provided that same connection. For instance, Sandleben's image was associated with the siterock account, and the computer hard drive seized from his apartment contained a folder titled "siterock." Moreover, that folder contained the videos of H.W. and L.N., which were also uploaded to TheCandidForum under the siterock account. Finally, H.W. testified that she saw an underwater camera in Sandleben's possession at the pool. Thus, while the trial court abused its discretion when it admitted the TWC record over objection, the other properly admitted evidence from trial supports Sandleben's convictions beyond a reasonable doubt. As a result, this error did not affect Sandleben's substantial rights, and we affirm on this issue.[10]

**Issue Four: Abuse of Discretion in Sentencing**

Sandleben also contends that the trial court abused its discretion when it sentenced him. Under the advisory sentencing scheme, "the trial court must enter a statement including reasonably detailed reasons or circumstances for imposing a particular sentence." Anglemyer v. State, 868 N.E.2d 482, 490 (Ind.2007), clarified in part on other grounds, 875 N.E.2d 218 (Ind. 2007). We review the sentence for an abuse of discretion, which occurs when "the decision is clearly against the logic and effect of the facts and circumstances." Id.

---

[10] Because we hold that this error was harmless beyond a reasonable doubt, we do not reach Sandleben's Confrontation Clause challenge. See Koenig v. State, 933 N.E.2d 1271, 1273 (Ind. 2010); Black v. State, 794 N.E.2d 561, 565 (Ind. Ct. App. 2003).

16

A trial court abuses its discretion when it (1) fails "to enter a sentencing statement at all[,]" (2) enters "a sentencing statement that explains reasons for imposing a sentence—including a finding of aggravating and mitigating factors if any—but the record does not support the reasons," (3) enters a sentencing statement that "omits reasons that are clearly supported by the record and advanced for consideration," or (4) considers reasons that "are improper as a matter of law." Id. at 490–91. If the trial court has abused its discretion, we will remand for resentencing "if we cannot say with confidence that the trial court would have imposed the same sentence had it properly considered reasons that enjoy support in the record." Id. at 491. However, the relative weight or value assignable to reasons properly found, or to those which should have been found, is not subject to review for abuse of discretion. Id.

Moreover, a finding of mitigating circumstances also lies within the trial court's discretion. Widener v. State, 659 N.E.2d 529, 533 (Ind. 1995). The court need not state in the record those mitigating circumstances that it considers insignificant. See Sensback v. State, 720 N.E.2d 1160, 1163 (Ind. 1999). And the trial court is not obligated to explain why it did not find a factor to be significantly mitigating. Chambliss v. State, 746 N.E.2d 73, 78 (Ind. 2001). Nor is the sentencing court required to place the same value on a mitigating circumstance as does the defendant. Beason v. State, 690 N.E.2d 277, 283-84 (Ind. 1998).

Sandleben's argument here asserts that the trial court failed to consider two of his three proffered mitigators: (1) Sandleben's remorse for his actions; and (2) the hardship placed on Sandleben's dependent child as a result of his sentence. However, the record

indicates that the trial court did consider both of these mitigators, but it gave little weight to the first and wholly rejected the second. The court stated:

> [I]t's difficult for the Court to determine when someone is remorseful or not remorseful, so the Court doesn't put a lot of weight into that. The Court understands the argument you make that it's a hardship on his dependent[;] I'm not sure that I can find that[,] the way he's victimized these other children.

Tr. at 107-08. This was not an abuse of discretion. Sandleben essentially argues that the trial court should have given more weight to these two mitigators, but the court was not required to do so. It did not have to place the same value on these mitigating circumstances that Sandleben assigns to them. We affirm on this issue.

**Issue Five: Inappropriateness of Sentence**

Finally, Sandleben contends that his sentence is inappropriate in light of the nature of the offense and his character. Article 7, Sections 4 and 6 of the Indiana Constitution "authorize[] independent appellate review and revision of a sentence imposed by the trial court." Roush v. State, 875 N.E.2d 801, 812 (Ind. Ct. App. 2007) (alteration in original). This appellate authority is implemented through Indiana Appellate Rule 7(B). Id. Revision of a sentence under Rule 7(B) requires the appellant to demonstrate that his sentence is inappropriate in light of the nature of his offenses and his character. Ind. Appellate Rule 7(B); Rutherford v. State, 866 N.E.2d 867, 873 (Ind. Ct. App. 2007). We assess the trial court's recognition or non-recognition of aggravators and mitigators as an initial guide to determining whether the sentence imposed was inappropriate. Gibson v. State, 856 N.E.2d 142, 147 (Ind. Ct. App. 2006). However, "a defendant must persuade

the appellate court that his or her sentence has met th[e] inappropriateness standard of review." Roush, 875 N.E.2d at 812 (alteration original).

Indiana's flexible sentencing scheme allows trial courts to tailor an appropriate sentence to the circumstances presented, and the trial court's judgment "should receive considerable deference." Cardwell v. State, 895 N.E.2d 1219, 1222, 1224 (Ind. 2008). The principal role of appellate review is to attempt to "leaven the outliers." Id. at 1225. Whether we regard a sentence as inappropriate at the end of the day turns on "our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other facts that come to light in a given case." Id. at 1224.

With respect to the nature of the offense, Sandleben repeats his sufficiency arguments. He contends that he did not film a private area and reasons that this makes his sentence inappropriate. We have already rejected that argument. Sandleben, at the least, attempted to film the naked pubic area of two twelve-year-old girls while they swam in a local pool. He then uploaded the videos of these two girls to the Internet. While these facts alone would support the sentence the trial court imposed, Sandleben also took an upskirt video of a four-year-old girl. Thus, the nature of Sandleben's offenses does not support a revision of his sentence.

In reference to his character, Sandleben points out that he had no prior criminal history, that his PSI assigned him a low-risk-to-reoffend classification, and that he expressed remorse for his crimes. But the trial court considered Sandleben's lack of a criminal record, and it expressly disagreed with the PSI assessment. The court stated, "I disagree with the probation department's recommendation[;] I think they're wrong in this

case[.] [T]hey don't understand how serious this crime is and how morally wrong what he did was and how criminal it was." Tr. at 108. In this regard, the court placed great weight on the aggravating circumstance that Sandleben had victimized three separate children on two different occasions. Again, the trial court considered, but did not give great weight to, Sandleben's remorsefulness. Considering, especially, the age of his victims, we cannot say that Sandleben's character supports a revision of his sentence. Thus, we conclude that the sentence imposed by the trial court was not inappropriate.

### Conclusion

In sum, we hold that sufficient evidence supported Sandleben's convictions for public voyeurism and that the public voyeurism statute, as applied, is not unconstitutionally vague. Moreover, while we hold that the trial court abused its discretion when it admitted certain business records over objection, those records were cumulative, which made the error harmless beyond a reasonable doubt. Finally, we hold that the trial court did not abuse its discretion when it sentenced Sandleben and that the sentence it imposed is not inappropriate.

Affirmed.

BAILEY, J., and PYLE, J., concur.

20