# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 21 2016, 7:42 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

T. Andrew Perkins
Peterson Waggoner & Perkins, LLP
Rochester, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Larry D. Allen
Deputy Attorney General
Indianapolis, Indiana

## IN THE
## COURT OF APPEALS OF INDIANA

Max Nicholson,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

April 21, 2016

Court of Appeals Case No.
25A03-1506-CR-764

Appeal from the
Fulton Superior Court

The Honorable
Wayne E. Steele, Judge

Trial Court Cause No.
25D01-0912-FC-535

**Kirsch, Judge.**

Following a jury trial, Max Nicholson ("Nicholson") was convicted of one count of Class C felony theft,[1] and six counts of Class D felony fraud.[2] Nicholson now appeals and raises the following two restated issues:

> I. Whether the trial court abused its discretion when it admitted into evidence credit card statements issued in the name of one of the victims, Robert Ragan ("Ragan"); and

> II. Whether the trial court abused its discretion when it admitted into evidence a copy of the front of a cashier's check issued from the bank account of another victim, Patricia Eber ("Eber").

We affirm.

## Facts and Procedural History

In the summer of 2002, Nicholson met Eber while attending a real estate conference in Florida. Eber lived in Rochester, Indiana, and at that time Nicholson was living in West Virginia.[3] A couple of months prior to their meeting, Eber had inherited a parcel of real estate in Indiana and another in Mississippi; each included a residence on the real property. She also inherited real estate in Tennessee, which was subdivided into lots but not yet developed. In addition, Eber was the beneficiary of $250,000.00 in life insurance proceeds.

---

[1] *See* Ind. Code § 35-43-4-2(a). We note that the statutes under which Nicholson was charged were amended effective July 1, 2014; however, we will apply the statutes in effect at the time that Nicholson committed his offenses.

[2] *See* Ind. Code § 35-43-5-4(1).

[3] Sometime in 2003, Nicholson moved to Rochester, Indiana. *Tr.* at 280.

Eber sold the two houses, and she deposited the proceeds along with the life insurance money into an account at Teachers Credit Union ("TCU"). Eber retained the Tennessee subdivision, which included an unfinished spec home upon which a contractor had placed a $35,000.00 mechanic's lien, which prevented Eber from selling the home. Eber attended the Florida real estate conference to acquire knowledge about real estate, since she now owned the Tennessee subdivided property. At the real estate conference, Eber talked with Nicholson, who was seated behind her, and Nicholson told Eber that he was experienced in real estate and development projects.

[4] Some weeks after the real estate conference, in August or September 2002, Eber contacted Nicholson to seek his advice about the mechanic's lien that remained on the spec home, as Eber wanted to sell it. Nicholson suggested a solution that involved issuing a bond on the property, which would allow her to sell it. Eber accepted his offer to assist her with accomplishing that task. To complete the sale of the spec home, Nicholson had Eber execute, in September 2002, a general power of attorney, naming him as her attorney-in-fact and giving him power over, among other things, real estate transactions, banking transactions, business operating transactions, access to checking and savings bank accounts, and "all other matters." *Tr.* at 259-61; *State's Ex.* 1. The spec home property eventually was sold. As for the rest of the Tennessee real estate, Nicholson directed Eber to place the land in a trust, with him as the trustee, and Eber did so.

In 2003, Nicholson approached Eber with the idea of investing in land development. Eber was interested and ultimately agreed with Nicholson's proposal, and they formed a company called The Group Incorporated ("The Group"). Nicholson was The Group's president and trustee, and Eber was the vice president. For purposes of funding The Group, Eber directed TCU to issue a cashier's check from her account in the amount of $323,726.47 payable to The Group. Eber personally handed the check to Nicholson. Eber also cashed out a Fidelity annuity, valued at approximately $100,000.00, and gave it to Nicholson to place in The Group for investment. Eber understood that these funds were to be used to buy property, develop it, and sell it. To Eber's knowledge, Nicholson never invested his own money in The Group. Nicholson told Eber to expect a ten percent return on her investment. At some point, Nicholson also advised Eber to transfer ownership of her Rochester residence into a trust, of which he was trustee, and Eber did so. *Tr.* at 272. He told her the purpose was to "protect the property." *Id.*

Eber, in addition to her own money and property, also invested $100,000.00 on behalf of her mother into The Group. Eber was power of attorney for her mother, and in that capacity, Eber executed a general power of attorney in September 2003 that gave Nicholson authority over Eber's mother's affairs. Eber's mother owned real estate, which was placed in a trust of which Nicholson was trustee. *State's Ex.* 6. Nicholson agreed to disburse income from The Group to cover the mother's living expenses, and he stated he would

issue a check to Eber every month for her use in paying her mother's expenses. This occurred for about three months and then stopped.

[7] In 2004, Nicholson "changed gears" away from developing real estate, as Eber had agreed to do, and Nicholson told Eber that he used money from The Group to purchase an Oregon-based golf equipment company called Harris International ("Harris"). *Tr.* at 262, 265. Nicholson did not consult with Eber before purchasing Harris. Following the purchase of Harris, Eber's relationship with Nicholson declined. Eber made attempts to reach Nicholson after her mother died in 2005, because Eber wanted to sell her mother's property that was in trust, but he avoided communicating with her.

[8] When Eber eventually confronted Nicholson about the financial arrangements and her ownership of Harris, Nicholson told Eber that her money was "gone." *Tr.* at 296. Eber also discovered that her Home Depot credit card had $11,205.34 in unauthorized charges on it. *State's Ex.* 5. Nicholson had changed the billing address on her Home Depot card, so that monthly statements were mailed to The Group, and Eber did not receive or see the statements. Eber checked on the Tennessee subdivision and found that many lots had been sold, but she had never seen any of the money.

[9] By January 2006, Eber wanted to end the business relationship with Nicholson. She hired a lawyer, and in February 2006, she executed a revocation of her power of attorney that had been executed in favor of Nicholson. *State's Ex.* 4.

Eber filed a civil suit against Nicholson, and she obtained a judgment against him. At some point in 2008, the matter was also referred to law enforcement.

[10] Meanwhile, in 2003, Nicholson responded to an online advertisement placed by Ragan, who had recently moved from New York to the Mishawaka/South Bend area. *Tr.* at 333-35. Ragan placed the ad looking for friends, as he was new to the area. The two met, and Nicholson told Ragan he was a financial advisor, had experience flipping properties, and could help Ragan with real estate investing. In December 2003, after the two had been friends for some months, and Nicholson had observed that Ragan struggled with the organization of his personal finances and payment of bills, Nicholson offered to assist Ragan with managing his financial affairs. Ragan agreed, and Nicholson began paying Ragan's bills for him, by making payment from Ragan's checking account. Nicholson had previously told Ragan that The Group was a company he utilized to buy and sell homes, and at some point, Nicholson suggested that Ragan change his billing address for his bills to The Group's address, to make it more convenient for bill payment, and Ragan agreed. Eventually, all of Ragan's bills and credit card statements were sent to The Group.

[11] In May 2004, Ragan executed a power of attorney, naming Nicholson as attorney-in-fact and trustee. *State's Ex.* 7. Thereafter, in the spring of 2004, Nicholson assisted Ragan with looking for a home to purchase in South Bend. Ragan borrowed $10,000.00 from his mother for a down payment, and Ragan wrote a check from his checking account to The Group. Ragan did not end up moving into a home in South Bend, and due to work changes, in 2005 Ragan

began investigating a move to Chicago. Ragan allowed Nicholson to keep the $10,000.00 because Nicholson told him that the money was invested and would have increased in value when he needed it to buy a home in Chicago. Ragan borrowed more money from his father to purchase a condominium in Chicago. Nicholson handled the paperwork and, shortly after the purchase, Nicholson directed Ragan to transfer ownership of the property into a trust with Nicholson as trustee, in order to "protect the property." *Tr*. at 342, 353. Nicholson also assisted in the paperwork when Ragan purchased a Nissan pickup truck. Originally the vehicle was titled in Ragan's name, but "almost immediately" it was transferred into a trust, of which Nicholson was trustee. *Id*. at 351.

[12] In April 2007, Ragan attempted to make an online purchase with his American Express Personal Gold card. The card was rejected, and when Ragan called American Express, he discovered that his account was frozen due to an outstanding balance of over $10,000.00. Thereafter, Ragan obtained a credit report and discovered outstanding balances on other credit cards, as well. He learned that four other credit cards had been issued in his name, although he did not apply for them: Bank of America, American Express Business Gold, Chase Bank, and USAA Savings Bank. *Tr*. at 358-84; *State's Exs*. 9-13. The outstanding balances totaled more than $115,000.00. Ragan learned that the monthly statements on the cards had been mailed to The Group. Ragan hired an attorney and, with the attorney's assistance, revoked the power of attorney that Ragan had executed in favor of Nicholson. In April 2007, Ragan made a police report about the credit card fraud. In November 2007, Ragan relocated

from Chicago to Indianapolis, and in June 2008, Eber made contact with Ragan to share her experiences with Nicholson and discuss being a victim of fraud.

[13] In December 2009, the State charged Nicholson with: Count I, Class C felony theft, alleging that he knowingly exerted unauthorized control over Eber's property, namely cash in excess of $100,000.00, with the intent to deprive her of its value or use; Count II, Class D felony fraud, alleging that Nicholson, with intent to defraud, obtained property by using Eber's Home Depot credit card without Eber's consent; and Counts III-VII, five counts of Class D felony fraud, alleging that Nicholson, with intent to defraud, obtained property by using five different credit cards belonging to Ragan without his consent, specifically: Bank of America, American Express Personal Gold Card, American Express Business Gold Card, Chase Bank, and USAA Savings Bank credit cards.[4] Nicholson fled Indiana, and a warrant was issued for his arrest. The State enlisted the assistance of, among others, the Federal Bureau of Investigation and the Indiana State Police Intelligence Division in locating Nicholson; Eber hired at least one private investigator. Nicholson was eventually located and apprehended in the state of Washington in February 2013.

[14] At trial, Eber testified that during the course of their business relationship, Nicholson had informed her that she owned 500 shares of Harris, but she never

---

[4] We note that the State initially filed Count VIII, another count of fraud, but later dismissed it.

received proof of ownership of either Harris or The Group. Eber testified that in 2005, their relationship starting "going downhill." *Tr.* at 288. She would try to reach him and ask for documentation, but he was not available and would not return her attempts to reach him. Although Nicholson told her that she was vice president of The Group, she did not engage in any transactions for the company; she did not write checks, or prepare documents, or have any direct involvement with it. She never received a receipt or some form of formal acknowledgement of the monies that she and her mother contributed to The Group. Although the Tennessee spec home sold, she never saw any of the proceeds. Eber testified that, for approximately a year and a half, she drove a Saturn Vue vehicle that was purchased by The Group in 2003; the Vue was one of three vehicles purchased by The Group, with the other two having been purchased in late 2002. Eber later learned that the two other vehicles were financed under her name using her credit.

[15] The State introduced Exhibit 3, which was the TCU cashier's check that Eber directed TCU to issue from her account in the amount of $323,726.43. It was payable to The Group. Nicholson objected on the grounds that the check was a duplicate and that there was no copy of the back of the check, which would have reflected who endorsed it. Nicholson argued the back of the check was necessary to see whether Nicholson or someone else had endorsed it, and thus had exerted control over the money. The trial court overruled Nicholson's objections, and it admitted the check into evidence.

[16] Eber testified that she personally gave the check to Nicholson. The check was payable to The Group, but Eber testified that Nicholson was the president and sole trustee of The Group. Eber testified that the money was withdrawn from her TCU account. Later, when Eber confronted Nicholson about all the money she had invested in the Group, he told her that the money was "gone," and there was nothing left. *Tr.* at 296. Eber never saw any of the trust documents that held her properties.

[17] Eber testified that, during her relationship with Nicholson, she did not know anyone named Robert Ragan; however, during the time that she began to pursue legal action against Nicholson, and she was at the courthouse doing research on Nicholson, she discovered a general power of attorney in which Ragan gave Nicholson power over his affairs. Eber's name appeared as a notary on the document, although she never had seen it before and did not notarize it. *Tr.* at 293; *State's Ex.* 7. Eber testified that she made contact with Ragan in June 2008.

[18] Ragan also testified. He explained that, after Nicholson noticed that Ragan was not too organized with his personal finances and payment of bills, Nicholson offered to assist with that task, but would not accept payment, stating he was doing it as a friend. At first, Nicholson picked up the bills from Ragan, and later, Ragan agreed to send the bills directly to Nicholson's business address at The Group. In May 2004, Ragan executed the general power of attorney naming Nicholson as his attorney-in-fact. Initially, Ragan's understanding of the reason for the power of attorney would be to assist with

the payment of Ragan's bills, and later he believed the power of attorney would be useful while Nicholson was helping Ragan purchase a residence in Chicago. During 2006 and 2007, after living in Chicago for a period of time, Ragan desired to take back control of his personal finances and affairs, as he was seeing and communicating less with Nicholson, who still lived in Indiana. Ragan asked Nicholson repeatedly to send him his bills and statements so that Ragan could pay them himself. Nicholson sporadically sent Ragan various bills, mostly utilities, but never sent him credit card statements.

[19] With regard to the American Express Personal Gold Card, Ragan explained that he had had that account since at least the late 1980s. He attempted to use it sometime in 2005, but it was denied, and when he called American Express, he was told of the balance and that the account was frozen due to nonpayment. Ragan believed that the charges were likely moving expenses that he incurred when moving to Chicago, so Ragan paid the balance in full, which was in excess of $13,000.00. Later in April 2007, he again was not able to make a purchase on the card, and when he inquired, he learned of a balance in excess of $10,000.00. Although Ragan had made some purchases, he knew that it would not have totaled that amount, so he began investigating and obtained a credit report, at which time he learned of at least four other credit cards in his name that he did not apply for or know existed: Bank of America, Chase, American Express Business Gold Card, and USAA Savings Bank. Ragan testified that Nicholson was the only individual who possessed a power of attorney for him and who could have had the power to open and change the

credit accounts. *Tr.* at 396, 410. After learning from the credit report of the unauthorized cards, Ragan contacted the various credit card companies and entered into payment agreements for the outstanding balances.

[20] The State introduced Exhibits 9 through 13, the five credit card statements in Ragan's name, which he did not apply for or open and which had charges on them totaling over $115,000.00. Nicholson objected to the admission of each of the exhibits, arguing that they were not properly authenticated. *Tr.* at 358-70. Nicholson also objected on the basis that the statements contained hearsay and that the State did not present the necessary evidence to have them admitted under the business records exception to the hearsay rule. The trial court admitted the five credit card statements over Nicholson's objections.

[21] Ragan testified that he never saw copies of the trust documents into which he had placed personal and real property. There came a point in time when Ragan wanted the pickup truck and his Chicago condominium out of the trust, but Nicholson had "disappeared," and Ragan could not reach him. *Id.* at 352.

[22] The jury found Nicholson guilty as charged. At the sentencing hearing, Nicholson testified, and he also made a statement to the trial court, which, along with asking for forgiveness, purported to "forgive the victims." *Id.* at 531. The trial court viewed Nicholson's statement as "narcissistic" and "rambling." *Id.* at 559. The trial court reviewed Nicholson's extensive lists of employers and charitable work, noting "[T]he Court's not buying it." *Id.* at 558. The trial court remarked, "You're trying to make this Court and this system your next

victim. And it's not going to happen." *Id*. at 557. The trial court found that "the anguish and the harm" to the victims was "immeasurable[,]" and it characterized Nicholson as "a predator." *Id*. at 560. The trial court thereafter sentenced Nicholson to eight years on the Class C felony theft conviction and three years each on the six Class D felony fraud convictions. The trial court ordered the sentences to run consecutively, for a total executed sentence of twenty-six years. Nicholson now appeals.

## Discussion and Decision

[23] Nicholson claims that the trial court abused its discretion when it admitted into evidence "documents purporting to be credit card statements from various financial institutions" and a copy of Eber's check in the amount of $323,726.43 from TCU payable to The Group. *Appellant's Br*. at 6. A trial court has broad discretion in ruling on the admissibility of evidence, and, on review, we will disturb its ruling only on a showing of abuse of discretion. *Wise v. State*, 26 N.E.3d 137, 143 (Ind. Ct. App. 2014), *trans. denied*; *Sandleben v. State,* 22 N.E.3d 782, 795 (Ind. Ct. App. 2014), *trans. denied*. An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Wise*, 26 N.E.2d at 143. When reviewing a decision under an abuse of discretion standard, we will affirm if there is any evidence supporting the decision. *Sandleben*, 22 N.E.2d at 795. A claim of error in the admission or exclusion of evidence will not prevail on appeal unless a substantial right of the party is affected. Ind. Evid. Rule 103(a); *Guiterrez v. State*, 961 N.E.2d 1030, 1034 (Ind. Ct. App. 2012). "In other words, even if the

trial court erred in admitting evidence, we will not reverse if that error was harmless." *Sandleben*, 22 N.E.3d at 795 (citing *Williams v. State,* 714 N.E.2d 644, 652 (Ind. 1999), *cert. denied* 528 U.S. 1170 (2000)).

## I. The Credit Card Statements

[24] Nicholson challenges the admission into evidence of the following credit card statements that were issued in Ragan's name but mailed to The Group: Exhibit 9 (Bank of America); Exhibits 10 and 10A (American Express, Personal Gold Card); Exhibit 11 (American Express, Business Gold Card); Exhibit 12 (Chase Bank); and Exhibit 13 (USAA Savings Bank). Nicholson challenges the admission of the exhibits on two grounds: the State failed to properly authenticate the credit card statements, and it failed to satisfy the requirements of the business records exception to the hearsay rule.

[25] Nicholson argues that the credit card statements were admitted into evidence despite "a lack of proper authentication." *Appellant's Br.* at 7. Nicholson asserts that under Indiana Evidence Rule 901(a), the party seeking to admit evidence must "produce evidence sufficient to support a finding that the item is what the proponent claims it is." In this case, the State presented the credit card statements through Ragan's testimony. Nicholson argues that, "[t]he only familiarity that Ragan had with most of the statements was that his name appeared on them[,]" and that Ragan's testimony was inadequate to provide proper authentication of the documents. *Id*. at 10. We disagree with Nicholson.

Ragan testified that he had possessed a personal American Express Gold Card for over two decades. Although the first time that the card was declined, when he tried to use it in 2005, he paid the outstanding balance of over $13,000.00 because he believed it must have been his moving expenses. However, when the card was again declined in 2007, and the balance exceeded $10,000.00, he knew that he had not made that amount of charges, so he obtained the statement from American Express. He also obtained a credit report and discovered that four other credit cards had been issued in his name, without his knowledge or consent, each with large balances: Bank of America; Chase Bank, American Express Business Gold Card account; and USAA Savings Bank. He personally obtained statements from those companies, saw that he had not made any of the charges reflected and, thereafter, engaged in separate negotiations with each of the issuing banks.[5] As Nicholson acknowledges, authentication can be established by direct or circumstantial evidence, and absolute proof of authenticity is not required; a reasonable probability that the document is what it purports to be is sufficient. *Appellant's Br.* at 7 (citing *Pavlovich v. State*, 6 N.E.3d 969, 976 (Ind. Ct. App. 2014), *trans. denied*). We find that Ragan's testimony was sufficient evidence to support a finding that the items were what Ragan claimed them to be, namely credit card statements for

---

[5] Ragan testified that he was required to pay one or more of the balances in full, because of the existing power of attorney, but that other banks wrote off the debt, or reached a compromise with him for partial payment in satisfaction of the debt.

cards issued in his name, without his knowledge, the balances of which, for several cards, he was held financially responsible, in full or in part.

[27] Next, Nicholson argues that the credit card statements constituted hearsay, did not qualify for admission under the business records exception, and should have been excluded from evidence. Hearsay is an out-of-court statement offered into evidence to prove the truth of the matter asserted. Evid. R. 801(c). Hearsay is inadmissible unless it falls under a recognized exception. Evid. R. 802. One such exception exists for records that satisfy the requirements of Evidence Rule 803(6), which provides,

> The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:
>
> . . . .
> **(6) Records of a Regularly Conducted Activity.** A record of an act, event, condition, opinion, or diagnosis if:
>
> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

> (E) neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.

[28] "In essence, the basis for the business records exception is that reliability is assured because the maker of the record relies on the record in the ordinary course of business activities." *In re Termination of Parent-Child Relationship of E.T.*, 808 N.E.2d 639, 643 (Ind. 2004). Business records are "imbued with independent indicia of trustworthiness.'" *Embrey v. State*, 989 N.E.2d 1260, 1264-65 (Ind. Ct. App. 2013) (quoting *Williams v. Hittle,* 629 N.E.2d 944, 947 (Ind. Ct. App. 1994), *trans. denied*). "These indicia are that the business establishes a routine of record-making, that the record is made by one with a duty to report accurately, and that the business relies upon that record in carrying out its activities." *Id*.

[29] Nicholson argues that because the State did not present the testimony of a custodian of the records or provide a certification for the documents, it thereby failed to provide sufficient foundation to admit the credit card statements under Evidence Rule 803(6). The State responds that circumstantial evidence established that they were trustworthy business records and, thus, properly admitted. It maintains, "Ragan's testimony was sufficient to show the records were regularly kept business records," explaining that Ragan's testimony, about receiving the statements and directly negotiating payment plans with the issuers, reflected that he relied upon the statements as accurate business records. *Appellee's Br*. at 15. The State further argues, "Almost everyone is familiar with the monthly statements they receive from financial institutions, including credit

card issuers[,] and, thus, "[T]he nature of the records themselves" reflects "their reliability as regularly kept business records." *Id.* at 16-17. However, the fact that Ragan relied on the records as being accurate or that "almost everyone" knows about and receives monthly credit card statements did not relieve the State from satisfying the requirements of Evidence Rule 803(6). *Id.* at 16.

[30] Evidence Rule 803(6)(D) requires that "all the conditions" under subsection (A), (B), and (C) – that the record was made at or near the time by someone with knowledge, was kept in the course of regularly conducted activity of the business, and making the record was a regular practice – be shown "by the testimony of the custodian" or "by certification[.]" *See also In re Paternity of H.R.M.*, 864 N.E.2d 442, 448 (Ind. Ct. App. 2007) (records of regularly conducted business activity "must be supported by testimony or an affidavit indicating that such records were kept in the normal course of business, and that it was the regular practice of the business to make such records").

> To our knowledge, this state has not adopted the approach taken by the federal courts which would permit the admission of business records based upon circumstantial evidence derived from the document itself, without the testimony of the custodian or another qualified witness. . . . Neither are we aware of any catch-all exception in Indiana similar to the Federal Rules of Evidence, Rule 803(24) which would allow a trial judge in the exercise of discretion to consider the inherent trustworthiness of the entry and the nature of the business which produced it.

[31] *Ground v. State*, 702 N.E.2d 728, 731 (Ind. Ct. App. 1998) (quoting *Cardin v. State*, 540 N.E.2d 51, 55 (Ind. Ct. App. 1989)).

[32] We have recognized that, as an exception to the hearsay rule, the business record exception must be strictly construed. *Speybroeck v. State*, 875 N.E.2d 813, 819 (Ind. Ct. App. 2007). In this case, the State presented neither the testimony of a custodian or a written certification. Ragan's testimony could not provide an adequate foundation to sponsor the credit card statements because he was not the custodian and did not have knowledge of the record sufficient to sponsor it; he did not explain how the record was created or that the company relied on it in the course of its business.[6] Thus, the trial court abused its discretion when it admitted the credit card statements over Nicholson's hearsay objections.[7] *See Sandleben*, 22 N.E.3d at 796 (witness could not provide adequate foundation to sponsor business record that showed internet subscriber information where witness was not custodian and did not have knowledge of how record was made or who created it); *Stahl v. State*, 686 N.E.2d 89, 92 (Ind. 1997) (error to admit bank's "affidavit of forgery" document, which had been completed by bank customer at bank's request to verify that defendant did not have authorization to use customer's ATM card, because requirements of Rule 803(6) were not met).

---

[6] Although a sponsor "need not have personally made [the record], filed it, or have firsthand knowledge of the transaction represented by it," a sponsor must still testify about how the record was made, who filed it, and that the person who filed it was both authorized to do so and had personal knowledge of the transaction. *Sandleben v. State*, 22 N.E.3d 782, 795 (Ind. Ct. App. 2014), *trans. denied*.

[33]     However, not all trial court error is reversible. We will affirm a defendant's convictions if error in admission of evidence was harmless. *Speybroeck*, 875 N.E.2d at 822. A claim of error in the admission or exclusion of evidence will not prevail on appeal unless a substantial right of the party is affected. *Sandleben*, 22 N.E.3d at 795. In determining whether error in the introduction of evidence affected a defendant's substantial rights, we assess the probable impact of the evidence on the jury. *Corbett v. State*, 764 N.E.2d 622, 628 (Ind. 2002).

[34]     Viewing the record in this case, we conclude that any error in the admission of the documents does not rise to the level of reversible error. The record as a whole reveals that Nicholson engaged in a similar pattern of conduct with Eber and Ragan. He befriended each of them, assessed their needs and vulnerabilities, and after gaining their trust, offered his assistance. He offered expertise and assistance with financial matters, and to best help each of them, he advised that he would need a general power of attorney, which Eber and Ragan each executed. This gave Nicholson broad control over their financial affairs. He advised that, to protect their assets, it would be best to put various assets into a trust, of which he was trustee. Eber and Ragan believed Nicholson and did as he suggested. In Ragan's case, Nicholson offered to assist Ragan with making payment of his monthly bills. Ragan testified that Nicholson recommended that, for ease, the bills be paid through his company, The Group. Ragan agreed to have the bills sent directly to The Group's business address.

[35] Because Nicholson committed the fatal misstep of failing to make one or more payments on Ragan's personal American Express Gold Card, the card was declined when Ragan tried to use it in 2007. This led to Ragan obtaining his statement from American Express, as well as a credit report, which revealed to Ragan that four other credit cards had been issued in his name without his knowledge and were being mailed to The Group. He testified that he obtained those credit card statements, and other than some of the charges on his personal American Express Gold Card bill, none of the charges on the other cards were attributable to him. Ragan testified that he communicated directly with those credit card issuers to attempt to have the balances removed, reduced, or otherwise arrange a payment plan. He entered into settlement agreements with American Express, Chase, Bank of America, and USAA Savings Bank. While the erroneously-admitted credit card statements illustrated specific purchases on specific dates on specific cards, that information was not the only evidence that connected Nicholson to having committed fraud by obtaining and using credit cards issued in Ragan's name.

[36] The State's evidence as a whole was sufficient from which the trier of fact could reasonably infer that Nicholson – who at the relevant time was the only person who possessed a power of attorney over Ragan's affairs and who was already paying Ragan's bills – obtained credit cards in Ragan's name, made unauthorized charges on the cards, and had the statements mailed directly to The Group. Thus, while the trial court erred in admitting the records over objection, the other properly admitted trial evidence supports Nicholson's

convictions beyond a reasonable doubt, and any error did not affect Nicholson's substantial rights. Accordingly, we hold that any error in the admission of the credit card statements, Exhibits 9-13, was harmless error. *See Sandleben*, 22 N.E.3d at 796 (although business record listing subscriber information was improperly admitted, it was harmless because other evidence supported convictions beyond reasonable doubt).

## B. Eber's Check

[37] Nicholson next argues that the trial court erred when it admitted Exhibit 3, a copy of Eber's check in the amount of $323,726.43 from TCU payable to The Group. Here, Eber identified the copy of the TCU cashier's check and explained that she directed the bank to issue the check, payable to The Group. She testified that the amount reflected her entire account balance, "down to the penny." *Tr.* at 263. Nicholson objected to the check, asserting that it was a copy and that "Evidence Rule 1002 requires the original," and he further argued that Exhibit 3 was not a complete document because it did not include a copy of the back of the check, which would show whether Nicholson, or someone else, endorsed it. *Id.* Eber testified that Exhibit 3 was the only evidence of the check that she was able to obtain from TCU. The trial court overruled Nicholson's objection, and with regard to the fact that the back of the check was not included, the trial court stated, "That may very well go to the weight, but the Court will overrule the objection[.]" *Id.* at 265.

[38] Our Rules of Evidence set forth rules concerning the admissibility of original and copies of various documentary and recorded forms of evidence. Generally, to prove the content of a writing, "the original writing, recording, or photograph is required" unless the Rules of Evidence or a statute provide otherwise. Evid. R. 1002. However, "[a] duplicate is admissible to the same extent as an original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate." Evid. R. 1003; *Wise*, 26 N.E.3d at 143. Here, Nicholson objected and argued that it was unfair to admit the duplicate because the back of the check was not included, thus "we're not able to see who endorsed the check," which is relevant to the case because "the entire crux" of the State's charges was that Nicholson "had some kind of control over the money." *Tr.* at 265.

[39] Upon review of the record before us, we find that the check was properly admitted. Eber identified the TCU check, when it was issued, to whom, in what amount, from what account, and at her direction. She testified that the funds were withdrawn from her account. Thus, we find that her testimony properly authenticated the check. We likewise reject Nicholson's argument that it was an abuse of discretion to admit the one-sided check because the reverse side of it was necessary to establish whether he did or did not exert control over the money, as was necessary to convict him of Class C felony theft, as charged. We disagree and find that other, circumstantial evidence was presented to the jury from which it could have inferred that Nicholson exerted unauthorized

control over Eber's property, "namely cash in excess of $100,000." *Appellant's App.* at 13.

[40] Nicholson presented himself to Eber as an experienced real estate investor. He was able to resolve the issue of the lien on the Tennessee spec home so that Eber could sell the property. Eventually, he proposed to Eber that he could assist her with real estate investing and that she could make ten percent on her investment. To this end, she withdrew her funds from TCU, ordering TCU to prepare the check for $323,726.43 payable to The Group. She handed the check to Nicholson, the president and trustee of The Group. Thereafter, the funds were removed from her TCU account. Eber also cashed out a Fidelity annuity, valued at approximately $100,000, and placed that into The Group. Eber also invested $100,000.00 of her mother's money into The Group. To Eber's knowledge, Nicholson never contributed any of his own money to The Group. Without her consent, Nicholson purchased Harris, a golf equipment company, even though he had told her that the money would be invested in real estate. She never received any income from the claimed investment. Nor did she receive any money from the Tennessee lots that she discovered had been sold. Later, when she asked Nicholson about her money that had been given to The Group for investment, Nicholson told her that the money was "gone." *Tr.* at 296, 300. Even without the endorsement on the back of the TCU check, we find that there was evidence from which a fact-finder could infer that Nicholson exerted control over Eber's property with the intent to deprive her of its use or value.

[41] Nicholson contends that he was deprived of "the opportunity to explore issues surrounding [the check's] endorsement." *Appellant's Br.* at 18. However, the record indicates that he did cross-examine Eber on the issue, asking "You don't actually know who cashed that check do you?" *Tr.* at 313. Eber conceded that, because she was not able to obtain a copy of the check that included the back side of it, she did not "know" who cashed the check. *Id.* Thus, Nicholson explored the issue with Eber, and the jury heard Eber's response. Nicholson has not shown that his substantial rights were affected by the admission of the check, and we find no abuse of trial court discretion.

[42] Affirmed.

[43] Mathias, J., and Brown, J., concur.