

**FILED**

Feb 21 2020, 7:50 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Bruce W. Graham
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Samuel J. Dayton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Jarmone Davis,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

February 21, 2020

Court of Appeals Case No.
19A-CR-1925

Appeal from the Tippecanoe
Superior Court

The Honorable Steven P. Meyer,
Judge

Trial Court Cause No.
79D02-1712-F2-28

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Defendant, Jermone Davis (Davis), appeals his conviction and sentence for one Count of corrupt business influence, a Level 5 felony, Ind. Code § 35-45-6-2(1); one Count of conspiracy to commit dealing in a narcotic drug of 10 grams or more, a Level 2 felony, I.C. §§ 35-41-5-2; -48-4-1(e)(1); and one Count of conspiracy to commit dealing in methamphetamine of at least 10 grams or more, a Level 2 felony, I.C. §§ 35-41-5-2; -48-4-1.1(e)(1).

We affirm in part, reverse in part, and remand with instructions.

# ISSUES

Davis raises three issues on appeal, which we restate as the following:

(1) Whether the State presented sufficient evidence beyond a reasonable doubt to convict Davis of his conspiracy convictions for dealing in a narcotic drug and dealing in methamphetamine;

(2) Whether Davis' conspiracy convictions violated Indiana's double jeopardy principles under the actual evidence test; and

(3) Whether the trial court abused its discretion at sentencing.

# FACTS AND PROCEDURAL HISTORY

On July 6, 2015, Lafayette Police Department Lieutenant Nicholas Amor (Lieutenant Amor) set up a controlled buy of narcotic drugs with the assistance of an undercover officer, Sergeant Randy Sherer (Sergeant Sherer), and an

unwitting informant[1], Harley VanHorn (VanHorn). After Sergeant Sherer picked up VanHorn, Lieutenant Amor followed them both to an area near McCarty Lane and Creasy Lane in Lafayette. Sergeant Sherer provided VanHorn with $100 of marked money, and VanHorn exited the police vehicle and walked through a grassy field. Sergeant Sherer subsequently observed a man, who was wearing red pants and a white shirt and later identified as Davis, approach and speak with VanHorn. Sergeant Sherer noticed VanHorn and Davis "do a hand-to-hand exchange." (Transcript Vol. II, p. 201). When VanHorn returned to Sergeant Sherer's vehicle, he handed Sergeant Sherer a small baggie containing a white substance, which was later established to be heroin. Later that day, Lieutenant Amor organized another controlled purchase of heroin. Sergeant Sherer was to pick up another unwitting confidential informant, Aldo Garcia (Garcia), and drive him to an apartment located at 3817 Sickle Court in Lafayette, which was approximately 100 meters from the location of the first controlled purchase. After Garcia was provided with police buy money, Sergeant Sherer saw Davis and Garcia conduct a "hand-to-hand transaction." (Tr. Vol. II, p. 206). When Garcia returned to Sergeant Sherer's car, he submitted the heroin he had purchased from Davis.

[5] On July 12, 2015, Lieutenant Amor organized another controlled purchase of heroin with the assistance of Sergeant Sherer and another unwitting informant,

---

[1] Sergeant Sherer testified that an unwitting informant is also usually a suspect and who is not aware of his active role in the controlled buy. In this case, VanHorn was not aware that Sergeant Sherer was an undercover officer or that he was engaged in a controlled buy.

Eduardo Tapia (Tapia). Sergeant Sherer picked up Tapia and drove to an apartment located on 3817 Sickle Court. Shortly thereafter, a red Pontiac Grand Prix, which was being driven by Davis, pulled up into the driveway. Sergeant Sherer provided Garcia with $100 of buy money. Both Garcia and Davis exited their respective vehicles, and after the two briefly talked, they went inside the apartment. Tapia returned to Sergeant Sherer's car and handed over a plastic bag containing a white substance, and it was later confirmed to be heroin.

[6] On July 27, 2015, Sergeant Sherer and Tapia conducted another controlled buy that Lieutenant Amor had arranged. After picking up Tapia, Sergeant Sherer drove to the 3817 Sickle Court apartment building. Upon arriving, Tapia was provided with $150 to buy heroin from Davis. Tapia went inside the apartment, and moments later, he returned to Sergeant Sherer's vehicle. Tapia handed Sergeant Sherer a baggie containing a white substance, which was later confirmed to be heroin.

[7] Three days later, on July 30, 2015, Purdue University Police Department Detective John Goetz (Detective Goetz) was acting as an undercover officer in a controlled buy of heroin orchestrated by Lieutenant Amor. The transaction involved Detective Goetz meeting and driving VanHorn to an apartment at 3817 Sickle Court to purchase additional heroin from Davis. VanHorn was supplied with $200 of buy money. When Detective Goetz and VanHorn arrived at 3817 Sickle Court, Detective Goetz observed VanHorn greet Davis, and watched them go inside the apartment. VanHorn afterwards exited an

apartment on 3817 Sickle Court and returned to Detective Goetz's vehicle and provided a baggie containing a white substance that later tested positive for heroin. As Detective Goetz drove away from the apartment, Lieutenant Timothy Payne (Lieutenant Payne), who was in another vehicle, remained behind to conduct surveillance. At separate times, three vehicles drove to the apartment, and left within minutes. Lieutenant Payne further observed the red Grand Prix reverse into the driveway and Davis exiting the vehicle and entering an apartment on 3817 Sickle Court. Lieutenant Payne then observed Davis and another man, later identified as Cordarow Davis (Cordarow), exit an apartment on 3817 Sickle Court get inside the red Grand Prix, and drive away.

[8]     Later that day, the police initiated two traffic stops of the vehicles that had been seen leaving 3817 Sickle Court. First, the police stopped a black Escalade, and during the search, the police found $201 in cash, a portion of which was from a prior controlled buy from Davis. The police also stopped the red Grand Prix. The driver was Davis and the other occupant was Cordarow. After Davis and Cordarow were detained, the police searched their persons. The police seized $992 from Cordarow and $250 from Davis. Of the money seized from Cordarow, $140.00 was from the buy money supplied by VanHorn earlier that day.

[9]     Later that day, the police returned to apartment A on 3817 Sickle Court to execute a search warrant. Over $7,000 in cash was recovered, and a portion of it was from the money issued from the controlled buys organized by Lieutenant Amor. Also, the police found a black scale with white residue on it,

hydrocodone pills, 14.55 grams of heroin, and a bottle of "Dormin," a sleeping aid, which is used to make "profits larger by cutting [the heroin] down" while "still providing a quality product." (Tr. Vol. III, p. 165). Based on mail and other documentation, the police determined that Cordarow and Davis were among the people residing in that apartment. The officers also found Indiana titles to a red Camaro and a red Pontiac Grand Prix as well as insurance records for those vehicles. The Camaro and the Grand Prix were titled and insured to a man named Malcom Gore (Gore). The following day, on July 31, 2015, Detective Goetz and Lieutenant Amor conducted a search of the red Camaro after Lieutenant Payne listened to a jail phone call between Davis and another person, where Davis stated that he had hidden money in the trunk of the Camaro that was parked in a storage facility. Following a search of the vehicle, the police seized $20,000 in cash.[2]

[10] In late 2016, the police received information from a confidential informant describing Davis and Cordarow as the suppliers of methamphetamine in Lafayette. The confidential informant indicated that the two were cousins. Between January 2017 and February 2017, the police utilized a confidential informant to buy methamphetamine from Davis. During one of the controlled buys, Cordarow was present.

---

[2] The record shows that on August 5, 2015, the State charged Davis with Level 2 felony conspiracy to commit dealing in a narcotic drug, Level 2 felony dealing in a narcotic drug, and Level 3 felony possession of a narcotic drug. However, those charges were later dismissed.

[11] On March 8, 2017, the Drug Task Force organized a controlled buy of four ounces of methamphetamine worth $2,800 from Davis. Sergeant Bradley Curwick (Sergeant Curwick) was provided with marked money, and the controlled buy was to take place at the Bay Pointe Apartments in Lafayette. Sergeant Sherer, whose role was to conduct surveillance, drove to a neighboring apartment complex and parked his car. Sergeant Sherer observed Davis drive a silver Pontiac Grand Prix and reverse into a parking spot. Accompanied by an informant, Sergeant Curwick walked over to Davis' silver Pontiac Grand Prix and got inside. Sergeant Curwick gave Davis $2,800, and after Davis counted the money, he gave Sergeant Curwick a bag containing drugs, which tested positive as 115.2 grams of methamphetamine.

[12] Sometime between March and April 2017, Sergeant Curwick exchanged text messages with Davis about buying five ounces of methamphetamine for $4,000. On April 25, 2017, Lieutenant Payne was to conduct a surveillance of that controlled purchase. Lieutenant Payne observed the same silver Grand Prix being driven by Davis on March 8, 2017, pull up in front of the Bay Pointe Apartments' office. An empty-handed Davis and another man exited the silver Pontiac Grand Prix and walked into the common area. Lieutenant Payne then saw Davis exit the apartment office with a brown Burger King sack, and Davis and the other man got inside the silver Grand Prix and drove away.

[13] Davis then called Sergeant Curwick, who was inside apartment 32 at the Bay Pointe Apartments, to confirm his address. Sergeant Curwick opened the door, and Davis entered and placed the brown Burger King sack on top of the TV

stand. Sergeant Curwick handed $4,000 to Davis, and after confirming the amount, Davis pointed at the brown sack and exited the apartment. Forensic examination revealed that the bag contained 138.79 grams of methamphetamine.

[14] On January 14, 2018, the police conducted a search of apartment number 112 at the Bay Pointe Apartments. Only one person, Gore, the man that owned the red Grand Prix which Davis had been seen driving in 2015, was inside the apartment. The police discovered that Davis and Cordarow also resided in the same apartment. During the search, the officers found $11,075 in cash, two digital scales, a bag containing 493 grams of methamphetamine, and inside a black Lincoln parked outside the apartment that the police had seen Cordarow drive during previous drugs sales, there was a kilogram of methamphetamine underneath the spare wheel.

[15] On December 28, 2017, the State filed an Information, charging Davis with Level 5 felony corrupt business influence, Level 2 felony conspiracy to commit dealing in a narcotic drug, Level 2 felony dealing in a narcotic drug, Level 3 felony possession of a narcotic drug, Level 2 felony conspiracy to commit dealing in methamphetamine, and three Counts of Level 2 felony dealing in methamphetamine. On May 7, 2018, the State filed an additional Information, charging Davis with Level 2 felony dealing in methamphetamine, Level 3 felony possession of methamphetamine, and Level 6 felony maintaining a common nuisance. On May 3, 2019, the trial court granted the State's request

to dismiss three Counts of Level 2 felony dealing in methamphetamine and one Count of Level 2 felony dealing in a narcotic drug.

[16] A four-day jury trial began on May 14, 2019. At the close of the evidence, the jury found Davis guilty of Level 5 felony corrupt business influence, Level 2 felony conspiracy to commit dealing in a narcotic drug, Level 2 felony dealing in a narcotic drug, Level 3 felony possession of a narcotic drug, Level 2 felony conspiracy to commit dealing in methamphetamine, and two Counts of Level 2 felony dealing in methamphetamine. The jury, however, determined that Davis was not guilty of one Count of Level 2 felony dealing in methamphetamine, one Count of Level 3 felony possession of methamphetamine, and one Count of Level 6 felony maintaining a common nuisance.

[17] On July 26, 2019, the trial court conducted a sentencing hearing. Due to double jeopardy concerns, the trial court vacated the following convictions: Level 2 felony dealing in a narcotic drug, Level 3 felony possession of a narcotic drug, and two Counts of Level 2 felony dealing in methamphetamine. The trial court subsequently sentenced Davis to six years for the Level 5 felony corrupt business influence conviction, eighteen years for the Level 2 felony conspiracy to commit dealing in a narcotic drug conviction, and eighteen years with six years suspended for the Level 2 felony conspiracy to commit dealing in methamphetamine conviction. The trial court ordered the sentences to run consecutively. Davis' executed sentence is thirty-six years.

[18] Davis now appeals. Additional information will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Sufficiency of the Evidence*

[19] When reviewing a claim of insufficient evidence, it is well-established that our court does not reweigh evidence or assess the credibility of witnesses. *Walker v. State*, 998 N.E.2d 724, 726 (Ind. 2013). Instead, we consider all the evidence, and any reasonable inferences that may be drawn therefrom, in a light most favorable to the verdict. *Id.* We will uphold the conviction "'if there is substantial evidence of probative value supporting each element of the crime from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.'" *Id.* (quoting *Davis v. State*, 813 N.E.2d 1176, 1178 (Ind. 2004)).

[20] Indiana Code section 35-48-4-1(a)(2)(C) provides that a person who possesses with intent to deliver a narcotic drug, pure or adulterated, classified in Schedule I or II commits dealing in a narcotic drug, a Level 5 felony. However, the offense is a Level 2 felony if "the amount of the drug involved is at least ten (10) grams." I.C. § 35-48-4-1(e)(1). To convict Davis of Level 2 felony dealing methamphetamine as charged, the State was required to prove beyond a reasonable doubt that he possessed methamphetamine in an amount of at least ten grams with intent to deliver it. I.C. § 35-48-4-1.1(e)(1).

[21] Davis does not challenge the sufficiency of the evidence with respect to any element of his underlying dealing felonies; rather, he challenges the conspiracy element as to both offenses. Specifically, he argues that the State failed to prove

beyond a reasonable doubt that "there was a separate agreement for delivery of methamphetamine, and yet another agreement for delivery of heroin." (Appellant's Br. p. 17).

[22] The offense of conspiracy is governed by Indiana Code section 35-41-5-2, which provides "[a] person conspires to commit a felony when, with intent to commit the felony, he agrees with another person to commit the felony." "The [S]tate must allege and prove that either the person or the person with whom he agreed performed an overt act in furtherance of the agreement." I.C. § 35-41-5-2(b). "A conspiracy to commit a felony is a felony of the same level as the underlying felony." I.C. § 35-41-5-2(a). The State is not required to prove the existence of a formal express agreement to establish a defendant agreed to deal in cocaine. *Simmons v. State*, 828 N.E.2d 449, 454 (Ind. Ct. App. 2005). The requisite agreement can be inferred from circumstantial evidence, including overt acts of the parties in furtherance of the criminal act. *Wallace v. State*, 722 N.E.2d 910, 913 (Ind. Ct. App. 2000).

[23] Here, the underlying felonies were dealing in heroin and dealing in methamphetamine. Thus, to convict Davis of both conspiracies to deal in heroin and methamphetamine, the State needed to prove that Davis intended to commit the felonies, agreed with another person to commit the felonies, and that Davis, or the person with whom he agreed performed an overt act in furtherance of the agreement.

For the Level 2 felony conspiracy to commit dealing in a narcotic drug, the State charged Davis as follows:

> During the time period from on or about January 1, 2015 through September, 2017 in Tippecanoe County, State of Indiana, Cordarow [], [] Davis, and/or unknown other person(s) did, with the intent to commit dealing in a narcotic drug, agree to commit dealing in a narcotic drug, and one or more of the following overt acts were performed in furtherance of said agreement, to wit: on one or more occasions Cordarow [], [] Davis, or other unknown person(s) obtained heroin; on one or more occasions Cordarow [], [] Davis, or other unknown person(s) possessed heroin with intent to deliver; on one or more occasions Cordarow [], [] Davis, or other unknown person(s) delivered heroin to other persons; on one or more occasions Cordarow [], [] Davis, or other unknown person(s) accepted payment for the heroin [] which they delivered; and on one or more occasions the amount of heroin involved was at least ten (10) grams.

(Appellant's App. Vol. II, p. 27), *See* I.C.§§ 35-41-5-2; -48-4-1(e)(1). As for Davis' Level 2 felony conspiracy to commit dealing in methamphetamine, the State alleged that

> [d]uring the time period on or about January 1, 2015 through January 2018, in Tippecanoe County, State of Indiana, Cordarow [], [] Davis, [] Gore, and/or unknown other person(s) did, with the intent to commit dealing in methamphetamine, agree to commit dealing in methamphetamine, and one or more of the following overt acts were performed in furtherance of said agreement, to wit: on one or more occasions Cordarow [], [] Davis, [] Gore, or other unknown person(s) obtained methamphetamine; on one or more occasions Cordarow [], [] Davis, [] Gore, or other unknown person(s) possessed

methamphetamine with intent to deliver; on one or more occasions Cordarow [], [] Davis, [] Gore, or other unknown person(s) delivered methamphetamine to other persons; on one or more occasions Cordarow [], [] Davis, [] Gore, or other unknown person(s) accepted payment for the methamphetamine which they delivered; and on one or more occasions the amount of methamphetamine involved was at least ten (10) grams.

(Appellant's App. Vol. II, p. 79), *See* I.C.§§ 35-41-5-2; -48-4-1.1(e)(1).

[25]    To support the conspiracy to deal in heroin charge, the State presented evidence from Lieutenant Amor, Sergeant Sherer, Detective Goetz, and other officers, regarding their involvement in the controlled buys of the heroin between Davis and three unwitting confidential informants in 2015. The State presented evidence that shortly after one of the drug buys, the police initiated a traffic stop of a red Pontiac Grand Prix, which was owned by Gore but being driven by Davis and occupied by Cordarow. Upon a search of their persons, the police seized $992 from Cordarow and $250 from Davis. Of the money seized from Cordarow, $140.00 was from money supplied by VanHorn and Detective Goetz. Further, during the search of the Sickle Court aprtment, the police seized 14.55 grams of heroin, and they also determined that Cordarow and Davis were among the people living in that apartment. Also, the police discovered that Davis had hidden $20,000 in the trunk of a red Camaro registered to Gore. Looking at all the evidence, it appears in 2015, Davis, Cordarow, and Gore conspired to deal in heroin from an apartment located at Sickle Court, Cordarow possessed a portion of the drug buy money when the police searched his person following a traffic stop, Davis drove Gore's red

Pontiac Grand Prix during the drug sales, and Davis had hidden $20,000 in the trunk of a red Camaro registered to Gore. Thus, we conclude that the State presented sufficient evidence beyond a reasonable doubt to sustain Davis' Level 2 felony conspiracy to commit dealing in a narcotic drug conviction.

[26] As for the Level 2 felony conspiracy to commit dealing in methamphetamine conviction, the State's charging Information alleged the existence of an agreement between Davis, Cordarow, Gore, and another unknown person, to commit the crime of dealing in methamphetamine. The record shows that prior to the March 2017 methamphetamine sale, a confidential informant had disclosed to the police that two cousins, Davis and Cordarow, were selling methamphetamine in Lafayette. Three controlled buys were conducted between January 2017 and February 2017. During those controlled buys, Davis, with the assistance of Cordarow, sold some methamphetamine to a confidential informant. In March 2017, Davis delivered 113.41 grams of methamphetamine worth $2,800 to Sergeant Curwick. In April 2017, Davis first drove to the Bay Pointe Apartments office to obtain the methamphetamine from an unknown individual. When he left the building, he had with him a brown Burger King sack. Shortly thereafter, Davis delivered to Sergeant Curwick 138.79 grams of methamphetamine, which was in the brown Burger King sack, and Sergeant Curwick handed $4,000 to Davis. During the search of apartment number 112 at the Bay Pointe Apartments, the police discovered that Gore leased the apartment, and that Davis, Cordarow, and others resided in that apartment. Also, the police recovered two digital scales, $11,075 in

cash, and an additional 493 grams of methamphetamine inside a cooler. Also, the black Lincoln parked outside the apartment, which the police had seen Cordarow drive during prior drug sales, had a kilogram of methamphetamine hidden under the spare tire. Here, the evidence shows that Davis acted with other individuals and conspired to deal in methamphetamine. Thus, we conclude that the State presented sufficient evidence beyond a reasonable doubt to sustain Davis' Level 2 felony conspiracy to commit dealing in methamphetamine conviction.

## II. *Actual Evidence Test*

Next, Davis claims that his conspiracy convictions for dealing in a narcotic drug and dealing in methamphetamine, violated the actual evidence test under the Indiana Constitution.

The Indiana Constitution provides that "[n]o person shall be put in jeopardy twice for the same offense." IND. CONST. art. 1, § 14. "Indiana's Double Jeopardy Clause . . . prevent[s] the State from being able to proceed against a person twice for the same criminal transgression." *Hopkins v. State*, 759 N.E.2d 633, 639 (Ind. 2001) (quoting *Richardson v. State*, 717 N.E.2d 32, 49 (Ind. 1999)). The Indiana Supreme Court has held that "two or more offenses are the 'same offense' in violation of Article I, Section 14 of the Indiana Constitution, if, with respect to either the statutory elements of the challenged crimes or the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense." *Richardson*,

717 N.E.2d at 49. An offense is the same as another under the actual evidence test when there is a reasonable possibility that the evidence used by the fact-finder to establish the essential elements of one offense may have been used to establish the essential elements of a second challenged offense. *Id.* The Indiana Supreme Court clarified this test in *Spivey v. State*, 761 N.E.2d 831, 833 (Ind. 2002), where the court held that the test is not whether the evidentiary facts used to establish one of the essential elements of one offense may also have been used to establish one of the essential elements of a second challenged offense; rather, the test is whether the evidentiary facts establishing the essential elements of one offense also establish all of the elements of a second offense. If the evidentiary facts establishing one offense establish only one or several, but not all, of the essential elements of the second offense, there is no double jeopardy violation. *Id.*

[29] The evidence from 2015 supporting the conspiracy to commit dealing in a narcotic drug was entirely different from the evidence from 2017 supporting the conspiracy to commit dealing in methamphetamine. Specifically, in 2015, officers conducted controlled purchases of heroin, Davis operated out of an apartment at Sickle Court, Davis' co-conspirator, Cordarow, possessed a portion of the buy money, and Davis used Gore's vehicles to transport and store sale proceeds of the heroin. More importantly, during the search of apartment number 112 at Sickle Court, the police did not recover methamphetamine.

[30] In 2017, Davis, Cordarow, and others were selling methamphetamine. Davis, Cordarow, Gore, and others, were residing at a different apartment in the Bay Pointe Apartments, and Davis was driving a different vehicle, a silver Pontiac Grand Prix. Three controlled buys were conducted between January and February 2017 between Davis, Cordarow, and a confidential informant. Other major controlled buys were conducted in March 2017, including one where Davis supplied Sergeant Curwick with 113.41 grams of methamphetamine worth $2,800. Another controlled drug buy occurred in April 2017, where Davis, with the assistance of others, obtained 138.79 grams of methamphetamine to sell to Sergeant Curwick. Also, during the search of apartment number 112 in Bay Pointe Apartments, the police discovered that Gore leased the new apartment, and that Davis, Cordarow, and others resided in that apartment. Also, the police recovered two digital scales, $11,075 in cash, and an additional 493 grams of methamphetamine stored inside a cooler, and the black Lincoln parked outside the apartment, which Cordarow had been seen driving, had a kilogram of methamphetamine hidden in it.

[31] The actual-evidence test is only violated if there is a reasonable possibility that the jury latched on to the same set of facts to support each conviction. *Garrett v. State*, 992 N.E.2d 710, 719 (Ind. 2013). Given the clear division in time, the change in physical location, the change in automobiles used, and the change in the drug being dealt, there is no reasonable possibility that the jury latched on to the same evidence to convict Davis of his conspiracy charges relating to the heroin and methamphetamine. As a result, we reject Davis' argument that

convicting him of the Level 2 felony conspiracy to commit dealing in a narcotic drug, and Level 2 felony conspiracy to commit dealing in methamphetamine, violated double jeopardy principles under the actual evidence test.

### III. *Consecutive Sentences*

[32] Sentencing decisions are matters left to the sound discretion of the trial court. *Anglemyer v. State*, 868 N.E.2d 482, 490, *clarified on reh'g*, 875 N.E.2d 218 (Ind. 2007). On appeal, we review a trial court's sentencing order only for an abuse of discretion. *Id*. It is an abuse of discretion if the trial court's "decision is 'clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom.'" *Id*. (quoting *K.S. v. State*, 849 N.E.2d 538, 544 (Ind. 2006)). Our supreme court has determined that in matters of sentencing, a trial court may abuse its discretion by failing to enter a sentencing statement, entering a finding of aggravating and mitigating factors that are unsupported by the record, omitting reasons that are clearly supported by the record and are advanced for consideration, or by including reasons that are improper as a matter of law. *Id*. at 490-91. If we find that the trial court has abused its discretion, we will remand for resentencing "'if we cannot say with confidence that the trial court would have imposed the same sentence had it properly considered reasons that enjoy support in the record.'" *Sandleben v. State*, 22 N.E.3d 782, 796 (Ind. Ct. App. 2014) (quoting *Anglemyer*, 868 N.E.2d at 491), *trans. denied*.

[33] Indiana Code section 35-50-2-4.5 provides that "A person who commits a Level 2 felony shall be imprisoned for a fixed term of between ten (10) and thirty (30) years, with the advisory sentence being seventeen and one-half (17 ½ ) years."

[34] In order to impose consecutive sentences, a trial court must find at least one aggravating circumstance. *Sanquenetti v. State*, 727 N.E.2d 437, 442 (Ind. 2000). Aggravating circumstances may include, but are not limited to, any of several statutorily enumerated factors. *See* I.C. § 35-38-1-7.1. A single aggravating circumstance may support the imposition of consecutive sentences. *Lavoie v. State*, 903 N.E.2d 135, 140 (Ind. Ct. App. 2009). Although a trial court is required to state its reasons for imposing consecutive sentences, it may rely on the same reasons to impose a maximum sentence and also impose consecutive sentences. *Id*.

[35] The trial court sentenced Davis to consecutive sentences of eighteen years for each of his Level 2 felony conspiracy drug conviction, and an additional six years for his Level 5 felony corrupt business practices conviction. However, the trial court suspended six years of the Level 2 felony conspiracy to commit dealing in methamphetamine for an executed sentence of thirty-six years.

[36] Davis' sole argument here, is that the trial court abused its sentencing discretion by imposing consecutive sentences for his conspiracy drug convictions, and in support of his argument, he directs us to *Beno v. State*, 581 N.E.2d 922 (Ind.1991), and *Hendrickson v. State*, 690 N.E.2d 765, 767-68 (Ind. Ct. App. 1998).

[37]     In *Beno*, the police arranged for a confidential informant to purchase cocaine from Beno at his residence on two different occasions. *Beno*, 581 N.E.2d at 923. Beno was then convicted of two Counts of dealing in cocaine and one Count of maintaining a common nuisance. *Id.* at 924. During the sentencing hearing, Beno was sentenced to the maximum term of imprisonment on each of the three convictions with each term to be served consecutively, for a total of seventy-four years imprisonment. *Id.* After accepting transfer, our supreme court determined Beno's sentence to be manifestly unreasonable. Specifically, it found that, although the trial court properly sentenced Beno to the maximum term on each Count, the trial court erroneously ordered the sentences to be served consecutively. *Id.* In reaching its conclusion, the supreme court noted that, although a trial court has discretion to impose both maximum and consecutive sentences, where a defendant is enticed by the police to commit nearly identical crimes as a result of a police sting operation, consecutive sentences are inappropriate. *Id.*

[38]     In *Hendrickson v. State*, 690 N.E.2d 765, 767 (Ind. Ct. App. 1998), the police conducted five controlled buys over a period of two months in which Hendrickson sold marijuana, methadone, and two different legend drugs. After the trial court imposed consecutive sentences, we revised the sentences to concurrent terms on appeal. *Id.* In so doing, we explained, "the purpose of *Beno* in prohibiting consecutive sentences when the police entice additional drug buys, applies whether or not different drugs are involved. Therefore, we

conclude that the holding in *Beno* is applicable even if the defendant provides a different type of drug during additional buys." *Id.*

[39] Although not cited by Davis, we find *Gregory v. State*, 644 N.E.2d 543, 544 (Ind. 1994) instructive in our analysis. In *Gregory*, Gregory sold cocaine to an informant on four separate occasions during a ten-day period. *Id.* As the result of the government sting operation, Gregory was convicted of four Counts of selling cocaine to the same police informant. *Id.* The trial court sentenced Gregory to the presumptive term of thirty years on each Count and ordered each Count to be served consecutively. *Id.* Our supreme court addressed whether the consecutive sentences were manifestly unreasonable and held that "[c]onsecutive sentences are not appropriate when the State sponsors a series of virtually identical offenses." *Id.* Specifically, the court held:

> As in *Beno*, Gregory sold the same drug to the same informant on several occasions over a short period of time. Presumably, the police could have set up any number of additional transactions, each time adding an additional [C]ount against Gregory. While the police may find it necessary to conduct a series of buys, the trial court should be leery of sentencing a defendant to consecutive terms for each [C]ount. We hold that on these facts, a sentence of 120 years was inappropriate.

*Id.* at 546.

[40] What is more, in *Williams v. State*, 891 N.E.2d 621, 635 (Ind. Ct. App. 2008), we held that the principle that "the State may not 'pile on' sentences by postponing prosecution in order to gather more evidence . . . applies equally to

convictions arising from evidence gathered as a direct result of the State-sponsored criminal activity." And, more recently, our supreme court took the same approach in holding that consecutive sentences were inappropriate where controlled buys led to a search and additional drug-related convictions. *Eckelbarger v. State*, 51 N.E.3d 169, 170 (Ind. 2016).

[41] Distinguishing the facts of this case from *Beno* and its progeny, the State argues that the trial court in this case did not impose the maximum possible sentence on Davis' Level 2 felony convictions as in *Beno*. Thus, the State argues that Davis' reliance on that case is misplaced. The State's argument ignores our holding in *Gregory*, where we found presumptive consecutive sentences to be inappropriate. Also, the State appears to argue that because there were two different drugs involved (*i.e.* heroin and methamphetamine), the trial court was justified in imposing multiple convictions. While the State's second argument is premised on the fact that different drugs were involved, it fails to so much as acknowledge our decision in *Hendrickson* in which we reversed consecutive drug convictions relating to the sale of different drugs.

[42] Similar to the defendants in *Beno*, *Hendrickson*, and *Gregory*, Davis was enticed by the police to make drug sales as part of a sting operation. While the drug buys happened over two years apart, which was not in close temporal proximity as the four days at issue in *Beno*, 581 N.E.2d at 923, or the two-month period in *Hendrickson*, 690 N.E.2d at 766, or the ten days at issue in *Gregory*, 644 N.E.2d at 544, the clear import we gather from *Gregory, Jones*, and *Williams,* is that they require that the "sentences for each conviction arising from evidence seized

after the State began sponsoring the criminal activity to run concurrently." *Williams*, 891 N.E.2d at 635. Under these circumstances, we find that Davis' consecutive sentences are not appropriate. *See id.*

[43] "When we find an irregularity in the trial court's sentencing decision, we may remand to the trial court for a clarification or a new sentencing determination, or affirm the sentence if the error is harmless, or impose a proper sentence." *Rios v. State*, 930 N.E.2d 664 (Ind. Ct. App. 2010). In the instant case, we elect to impose a proper sentence pursuant to the cases cited, and order that Davis serve concurrent eighteen-year terms on the conspiracy to commit dealing in a narcotic drug and methamphetamine convictions with no sentence suspended. All other aspects of his sentence, including the six-year sentence for his Level 5 felony corrupt business influence conviction, are affirmed, and we remand to the trial court with instructions to enter a new sentencing order consistent with this opinion.

# CONCLUSION

[44] Based on the foregoing, we conclude that the State presented sufficient evidence beyond a reasonable doubt to sustain Davis' conspiracy convictions and his conspiracy convictions did not violate double jeopardy principles under the actual evidence test. However, we reverse his consecutive sentences as to the Level 2 felony conspiracy to commit dealing in heroin and methamphetamine convictions, finding them inappropriate, and remand to the trial court to issue a new sentencing order consistent with this opinion.

Affirmed in part, reversed in part, and remanded with instructions.

Baker, J. and Brown, J. concur